**John M. SHANK, Jr., and Access International Markets, Ltd., Plaintiffs–Appellants,**

v.

**WILLIAM R. HAGUE, INC., Defendant–Appellee.**

No. 98–3225.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1999.

Decided Sept. 20, 1999.

Bruce C. O'Neill (argued), Fox, Carpenter, O'Neill & Shannon, Milwaukee, WI, for Plaintiffs–Appellants.

John A. Busch (argued), Michael, Best & Friedrich, Milwaukee, WI, for Defendant–Appellee.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

KANNE, Circuit Judge.

This case arises out of an international distribution contract for the marketing and sale of a water conditioning product between the Defendant, William R. Hague, Inc. ("Hague"), and Michael Sieren and his company, WaterBoss International Marketing, Inc. (collectively "Sieren/WIM"). The Plaintiffs, John M. Shank, Jr. ("Shank"), and Access International Markets, Ltd. ("Access"), a corporation solely

owned by Shank, contracted with Sieren/WIM to act as Sieren/WIM's international sales representative for the sale and distribution of this product. Plaintiffs subsequently filed suit against Hague alleging that Hague tortiously interfered with Plaintiffs' actual and prospective contracts and business relationships with members of an international distribution network created by Plaintiffs for the sale and distribution of water conditioning products. The district court granted summary judgment in favor of Hague concluding that Plaintiffs failed to raise a genuine issue of material fact regarding whether they had existing or prospective contracts with the members of the distribution network. Plaintiffs now appeal. For the reasons set forth below, we affirm the decision of the district court.

## I. HISTORY

Hague is a corporation involved in the manufacture of, among other things, a water conditioning product called the Water-Boss. In 1989, Hague entered into two written agreements with Sieren/WIM for the marketing and selling of the Water-Boss. The first contract, referred to as the "Marketing and Sales Agreement," made Sieren/WIM responsible for the marketing and sale of the WaterBoss and related products in North America. The other contract, referred to as the "Distribution Agreement," made Sieren/WIM the exclusive distributor of the WaterBoss and related products in Europe, and later, in the Pacific Rim countries and Latin America. Hague began manufacturing the WaterBoss in 1991 and Hague and Sieren/WIM later agreed that the first operative year under both agreements would be the fiscal year ending January 31, 1993.

Under these contracts, Hague had no right to control the manner in which Sieren/WIM conducted their business activities and the agreements left Sieren/WIM with the discretion to hire sub-agents or contractors to assist them in marketing and selling WaterBoss products as they saw fit.

Because Sieren/WIM did not have an existing international distribution network, Sieren/WIM contracted with Plaintiffs to act as their international sales representative and to sell WaterBoss products in the international market. The written agreement between Plaintiffs and Sieren/WIM granted Plaintiffs the exclusive right to solicit orders for WaterBoss products first within Europe and the Pacific Rim and later in all geographical areas except for the United States and Canada. Sieren/WIM retained the right to set the prices and terms of sale for WaterBoss products and in all other respects reserved their rights under the Distribution Agreement to control the marketing and distribution policies for WaterBoss products in the international market. That agreement further provided that Shank and Access would operate as independent contractors, not as employees or sub-agents of Sieren/WIM. Sieren/WIM compensated Plaintiffs for their services in generating sales of WaterBoss products by paying Plaintiffs a commission on each sale they generated, provided the sale was accepted by Sieren/WIM. Although Hague was not a party to that agreement, Shank indicates that Hague was aware of and approved of the relationship between Plaintiffs and Sieren/WIM.

Shank maintains that he created the international distribution and sales network for WaterBoss products independently of both Sieren/WIM and Hague. This network eventually consisted of one sales representative, C.O.B. International S.A.R.I. ("COB") in France, which obtained several dealer agreements throughout Europe, and around fifteen distributors located throughout the remaining geographical area covered by the Distribution Agreement. Several of these contacts grew out of Shank's prior dealings with various principals associated with COB and certain of the distributors. For example, Shank indicated that he obtained COB as the sales representative as a result of his prior dealings with COB's owner, Joel Cobigo,

when both worked at another corporation. With respect to the distributors, Shank maintains that he knew of and dealt with many of them before he recruited them to distribute WaterBoss products and that the remaining distributors were otherwise procured through wholly independent action on his part. According to Shank, he and Access spent years and substantial sums of money developing, fostering, and maintaining this distribution network and Shank's relationship with the network's companies and principals. Shank also submits that he intended the network to distribute products other than, or in addition to, WaterBoss products.

However, Plaintiffs had no written contractual relationship with any member of the distribution network. Instead, COB and the distributors entered into written contracts directly with Sieren/WIM to sell and distribute WaterBoss products exclusively. Shank's efforts in procuring and maintaining the distribution network were rewarded by the receipt of commissions from Sieren/WIM upon the sale of WaterBoss products. Under the terms of the Distribution Agreement, Hague agreed to sell WaterBoss products to Sieren/WIM at cost plus thirty percent. Upon Hague's receipt of payment from a customer, it would pay Sieren/WIM the difference between the cost of the product plus thirty percent, and the sale price of the product. Sieren/WIM would then pay Access a commission out of the sums received from Hague. Access in turn was directed to pay its sales representative COB a commission from the sums received from Sieren/WIM to the extent it was involved in any sale. The distributors received no payment from either Sieren/WIM or Access because they functioned as the ultimate purchasers of the products.

Notwithstanding the written agreements between Sieren/WIM and the individual members of the distribution network, Plaintiffs claim to have had oral agreements with the members of the network for the members to act as Plaintiffs'

representative and distributors, not just for WaterBoss products, but also for competing product lines which Access would distribute in the future. Moreover, while COB and the distributors executed written contracts with Sieren/WIM, Plaintiffs maintain that they and Sieren/WIM treated those agreements as being between Access and the representative and distributors and that in practice the members of the distribution network reported directly to and took directions principally from Shank and Access and would only secondarily contact Sieren/WIM. As evidence of that relationship, Shank indicated that he prepared customer invoices, received purchase orders from the members of the network, and prepared shop assembly instruction sheets, which gave Hague directions on how to build WaterBoss products to customers' specifications. Plaintiffs delivered the purchase orders, shop assembly instructions and other special instructions Plaintiffs received from members of the distribution network directly to Hague rather than Sieren/WIM. Plaintiffs also maintain that they had the authority and bore the responsibility to hire and fire international sales representatives and distributors. Under Plaintiffs' account of the working relationship between and among Sieren/WIM, Plaintiffs, and the members of the distribution network, Sieren/WIM played no substantive role in the distribution network's activities. Instead, Plaintiffs indicate that they were in charge of the distribution network—a network Plaintiffs submit belonged to them, not Sieren/WIM.

Hague terminated the Marketing and Sales Agreement in March 1997 after determining that Sieren/WIM was not fulfilling its contractual obligations under the terms of that contract. In June 1997, Sieren/WIM filed a lawsuit against Hague based upon Hague's termination of the Marketing and Sales Agreement. Because of the nature of the allegations leveled by Sieren/WIM in the complaint in that suit

and other undisclosed actions taken by Sieren/WIM, Hague began to question whether Sieren/WIM could in good faith act in Hague's best interests under the Distribution Agreement. To protect its goodwill and reputation in the international marketplace, Hague decided to cease selling WaterBoss products through Sieren/WIM under the Distribution Agreement. In a September 1997 letter, Hague formally notified Sieren/WIM that it would not renew the Distribution Agreement beyond its October 1997 anniversary date. The September letter further stated, however, that it was Hague's position that Sieren/WIM terminated the Distribution Agreement in June 1997 when they filed suit against Hague because the allegations contained in Sieren/WIM's complaint established that Sieren/WIM did not intend to continue with the Distribution Agreement.

During the period beginning with Hague's termination of the Marketing and Sales Agreement and ending with the formal termination of the Distribution Agreement, Hague continued to manufacture WaterBoss products for international distribution and Hague continued to accept orders generated by Plaintiffs' international sales of these products. In July 1997, Hague contacted Shank regarding the deteriorating relationship between Hague and Sieren/WIM and informed Shank that Hague wished to maintain its "strong business relationship with Shank and others" and that Shank could expect to hear from Hague in the future. However, after reaching the determination that it could no longer rely on Sieren/WIM to sell WaterBoss products internationally, Hague decided that it would directly maintain the international market for which Sieren/WIM had formally been the exclusive distributor. To facilitate that transition, Hague contacted the international customers (the members of the distribution network) to inform them that any orders for WaterBoss products would now be handled directly by Hague. Customers were no longer to place their orders with Sieren/WIM or Plaintiffs but rather were to contact Hague directly. According to Shank, Hague did not inform Plaintiffs that it would be taking over the international distribution network until after it had arranged for direct dealings with COB and many of the distributors. Hague eventually refused to accept any orders from Plaintiffs or Sieren/WIM.

Plaintiffs subsequently filed suit against Hague alleging two claims. First, Plaintiffs claimed that Hague tortiously interfered with their actual and prospective contractual and business relationships with the members of the international distribution network. Plaintiffs contended that Hague's conduct in directing COB and the distributors to transact directly with Hague to sell WaterBoss products destroyed Plaintiffs' relationships with many members of the distribution network and caused those members to breach their agreements and relationships with Shank and Access to sell and distribute WaterBoss products and or competing water conditioning products. Second, Plaintiffs claimed that Hague tortiously interfered with the contract between Plaintiffs and Sieren/WIM. By taking over direct control of the international distribution network and refusing to accept orders from Shank and Access, Plaintiffs contended that they were prevented from performing and fulfilling their contractual obligations to Sieren/WIM under the terms of their agreement.

Hague moved for summary judgment on both of Plaintiffs' claims, and the district court granted Hague's motion. Plaintiffs appeal only the district court's dismissal of the first claim. With respect to that claim, the district court found that Plaintiffs failed to raise a genuine issue of material fact regarding whether they had either existing or prospective contractual relationships with the members of the distribution network—an essential element of Plaintiffs' tortious interference claim under

Wisconsin law.[1]

## II. STANDARD OF REVIEW

■ We review a district court's grant of summary judgment *de novo*. *See Adler & Drobny, Ltd. v. United States*, 9 F.3d 627, 629 (7th Cir.1993). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994).

## III. ANALYSIS

■ Wisconsin law "protects legitimate competition from predatory tactics by subjecting anyone who wrongfully interferes with existing or prospective contractual relations to liability." *Pure Milk Prods. Coop. v. National Farmers Org.*, 90 Wis.2d 781, 280 N.W.2d 691, 698 (1979). To that end, Wisconsin "recognizes as a cause of action the tortious interference with existing and prospective contractual relations." *Duct–O–Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir.1994) (applying Wisconsin law); *see also Cudd v.*

*Crownhart*, 122 Wis.2d 656, 364 N.W.2d 158, 160 (1985) (noting that a plaintiff has a cause of action under Wisconsin law to protect against "interference with existing contractual relations and for tortious interference with prospective contractual relations"). To prevail on a tortious interference claim under Wisconsin law, a plaintiff must satisfy five elements: (1) an actual or prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere. *See Duct–O–Wire*, 31 F.3d at 509.

■ To survive Hague's motion for summary judgment, Plaintiffs had to establish that there was a genuine issue of material fact as to each of these five elements. *See generally Common v. Williams*, 859 F.2d 467, 469 (7th Cir.1988) ("Summary judgment is properly entered in favor of a party when the opposing party is unable to make a showing sufficient to prove an essential element of a case on which the opposing party bears the burden of proof."). In granting summary judgment in favor of Hague, the district court focused solely on the first element required for the establishment of a tortious interference claim and concluded that Plaintiffs failed to raise a genuine issue of fact that any contracts or prospective contracts existed between Plaintiffs and the sales representative and distributors. On appeal, Plaintiffs submit four alternative arguments in support of their contention that the district court erred in reaching this conclusion.

### A. Existence of Oral Contracts

■ Plaintiffs first argue that they submitted sufficient evidence to raise a genuine issue of material fact whether they had

---

**1.** Jurisdiction in this case is based on diversity of citizenship, and the district court analyzed Plaintiffs' claims under Wisconsin law.

All parties to this appeal agree that Wisconsin law applies.

existing "oral contracts" directly with the members of the international distribution network for the sale of WaterBoss and competing products. The evidence that Plaintiffs placed before the district court in support of the existence of these claimed oral agreements consisted predominantly of allegations contained in Shank's self-serving affidavit filed in conjunction with Plaintiffs' opposition to Hague's motion for summary judgment. In his affidavit, Shank attested that he had oral agreements with fifteen listed international distributors. With respect to the content of those agreements, Shank further attested that the members of the distribution network agreed that "they would act as [his] and [his] company's representative/distributors, not just for WaterBoss products, but for other product lines which [his] company would distribute in the future." The members also purportedly agreed that Shank was in charge of the network and that they would take directions from Shank, not Sieren/WIM.

We agree with the district court finding that Plaintiffs have failed to proffer competent evidence to create a genuine issue of material fact on the question of whether Plaintiffs had oral contracts with the members of the distribution network. Although Shank believes that his affidavit is sufficient alone to establish the existence of these oral agreements, this Court has consistently repeated that "[s]elf-serving affidavits without factual support in the record will not defeat a motion for summary judgment." *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir.1993); *see also Haywood v. North Am. Van Lines, Inc.,* 121 F.3d 1066, 1071 (7th Cir.1997) ("[C]onclusory allegations and selfserving affidavits, if not supported by the record, will not preclude summary judgment."). In this case, there is a noticeable absence of evidence in the record to support the assertions contained in Shank's affidavit.

First, those same third parties with whom Plaintiffs allege to have entered into oral contracts to sell both WaterBoss and other water conditioning products executed written contracts with Sieren/WIM to act as Sieren/WIM's exclusive representatives for the sale of WaterBoss products in their respective geographic territories. The terms of those contracts also precluded the members of the distribution network from manufacturing, purchasing, selling or otherwise representing any type of competing products and goods. The allegations in Shank's affidavit concerning the nature of the alleged oral contracts between Plaintiffs and the members of the distribution network stand in direct conflict with the contractual obligations assumed by the members of the network in their written contracts with Sieren/WIM.

Second, Shank failed to come forward with an affidavit or any other affirmative evidence from any member of the distribution network with whom he claims to have had an oral contract to substantiate the existence of even one oral contract. In a situation in which a plaintiff claims to have an oral contractual relationship with a third party, it is prudent for such a plaintiff to have an affirmation of some kind from the third party, or evidence from which it can be reasonably inferred, to substantiate the existence of the alleged relationship. Shank claims on appeal that he could not have procured a confirmatory affidavit from the sales representative or any of the distributors because they are now under Hague's control and rely on Hague for their economic livelihood. However, our review of the record reveals that Plaintiffs made no effort to obtain an affidavit from any of the members of the distribution network to support Plaintiffs' opposition to Hague's motion for summary judgment. There is also no indication in the record that Plaintiffs sought to depose any of the principals at those companies nor did Plaintiffs produce any tangible evidence that indicated an unwillingness on the part of the members to testify as to the relationship they had with Plaintiffs

notwithstanding the power of the subpoena. ·

At the summary judgment stage, the party opposing a motion for summary judgment must take reasonable steps to provide the district court sufficient evidence to create a genuine issue of material fact to defeat the motion. *See Schacht v. Wisconsin Dep't of Corrections*, 175 F.3d 497, 503–04 (7th Cir.1999) (indicating that summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events"). Plaintiffs' speculation that all of the members of the distribution network would refuse to testify under oath as to the nature of the relationship between them and Plaintiffs is wholly insufficient to justify Plaintiffs' failure to come forward with, or to at least make a colorable attempt to procure, a confirmatory affidavit from at least one of these members as to the existence of an oral contract.

Notwithstanding Plaintiffs' failure to provide the affidavit of the sales representative or any of distributors with whom Plaintiffs claim to have had an oral contract, Plaintiffs argue that Shank's affidavit is sufficiently supported by the history of Shank's relationship with the members of the distribution network and the course of conduct between Plaintiffs and those members during the time span that the Distribution Agreement was in effect. That Shank. drew upon his prior experiences in lining up the representative and distributors who eventually contracted directly with Sieren/WIM to become members of the international distribution network, however, does not support the inference that Plaintiffs had any oral contracts with those members. Plaintiffs' efforts in developing, maintaining and serving as the principal contact for the distribution network were entirely consistent with their contractual obligations under their contract with Sieren/WIM and Plaintiffs

were well compensated for their role in this network.

Moreover, the independent evidence originating from the members of the distribution network that does exist in the record undercuts Plaintiffs' claims as to the existence of any oral contracts. Upon receiving notice that they were to begin dealing directly with Hague, several of the distributors contacted Plaintiffs in writing to comment on the now streamlined arrangement for the distribution of Water-Boss products. For example, one distributor wrote to Plaintiffs that "it has really been a pleasure working with you and it is regrettable that we are not having other business topics to further proceed in the future.... We want to wish you all success in your business ..." Another distributor wrote, "We are very sorry for what is happening [to] you and [Sieren].... I want to thank you for your help during these last 4 years. We have done a good business, and it is thanks to you. Here, we have always felt friendship and sincerity with you, and this will never stop.... Please, let me know if you have got new business." Although courts are expected to draw inferences in a light most favorable to the non-moving party when evaluating a motion for summary judgment, we have repeatedly indicated that courts "are not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) (citation omitted); *see also Bombard*, 92 F.3d at 562. Although these sorts of statements clearly express sentiment regarding the termination of an amicable business relationship, we do not believe that they can be reasonably construed as substantiating the existence of any oral contract that was being interfered with by Hague's actions.

In light of the existence of written contracts between Sieren/WIM and the members of the distribution network, the self-serving and conclusory nature of Shank's affidavit, and the lack of independent evi-

dence in the record to support Shank's allegations concerning the existence of these oral contracts, we conclude that the district court did not err in finding that Plaintiffs failed to offer sufficient evidence to create a genuine issue of material fact on the question whether they had oral contracts with the members of the distribution network.

## B. Existence of Prospective Contracts

Plaintiffs' second argument on appeal is that sufficient evidence existed before the district court to show that they had "prospective contracts" with members of the distribution network. As we stated above, a plaintiff may bring a cause of action against a defendant under Wisconsin law for "tortious interference with ... prospective contractual relations." *Duct–OW-ire*, 31 F.3d at 509; *see also Cudd*, 364 N.W.2d at 160 (noting that Wisconsin recognizes a "cause of action for the intentional interference with another's prospective contractual relation"). However, as the district court noted in rejecting this argument below, in order to ward off summary judgment, Plaintiffs were still required to provide sufficient evidence to show that they actually had prospective contracts with the members of the distribution network. The district court concluded that Plaintiffs failed to do so and we agree.

In support of their contention that they had prospective contracts with the members of the network, Plaintiffs again relied primarily on statements contained in Shank's affidavit. In his affidavit, Shank attested that Plaintiffs intended to contract eventually with the members of the distribution network to distribute either WaterBoss products or non-WaterBoss water-conditioning products. But for Hague's actions, Shank asserts those members would be selling some water conditioning product for Plaintiffs. Shank also stated that Hague's conduct prevented Shank from solidifying business relations that he was developing with potential distributors.

For the same reasons we identified above with respect to our determination that the district court did not err in concluding that Plaintiffs failed to present sufficient evidence to create a genuine issue of material fact regarding the existence of oral contracts with members of the distribution network, we likewise conclude that Plaintiffs have failed to satisfy their burden on this issue. Once again, Plaintiffs have failed to come forward with affidavits or any other evidence from the members of the network (or any of the alleged prospective new distributors) to substantiate Shank's statements regarding the existence of prospective contracts. It goes without saying that a legally binding contract is one in which the parties manifested their intention to be bound to an agreement, the terms of which are sufficiently certain and definite. *See, e.g., Novelly Oil Co. v. Mathy Constr. Co.*, 147 Wis.2d 613, 433 N.W.2d 628, 630 (1988) ("Wisconsin law has long recognized that '[t]he essence of a contract is that the minds of the parties thereto must meet on the same thing.'" (quoting *Zuelke v. Gergo*, 258 Wis. 267, 45 N.W.2d 690, 692 (1951))). Plaintiffs' failure to come forward with any evidence as to the intent of the members of the distribution network to enter into contracts with Plaintiffs is necessarily fatal to their claim that they had prospective contractual relationships with those members. Moreover, we have already indicated that self-serving affidavits of the kind submitted by Shank in this case are not sufficient to create a genuine issue of material fact at the summary judgment stage. *See Haywood*, 121 F.3d at 1071; *Slowiak*, 987 F.2d at 1295; *see also Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir.1991) ("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion."). "When it is plain that the plaintiff has no case that could persuade a reasonable jury, the defendant is entitled to summary judgment." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d

1568, 1572 (7th Cir.1989). Given the lack of independent factual support in the record for Shank's self-serving affidavit, the district court did not err in concluding Plaintiffs failed to show the existence of any prospective contracts with the members of the distribution network.

### C. Existence of Business Relationships

Plaintiffs next contend that they satisfied their burden of proving the existence of a protected relationship under Wisconsin law by showing that they had "business relations" with members of the distribution network. Plaintiffs argued below that the tort of intentional interference encompasses not only tortious interference with existing and prospective contractual relations but also tortious interference with actual or prospective "business relations." Plaintiffs submitted that they only needed to show that they had, or would have had, continuing economic relations with the members of the distribution network in order to satisfy the first element of a tortious interference claim under Wisconsin law.

The district court rejected Plaintiffs' invitation to expand the traditional scope of this tort. The district court concluded that notwithstanding the fact that a few courts "have made passing reference to economic or business relations" in reviewing a claim for tortious interference under Wisconsin law, those references were always made "in the context of there being at least sufficient evidence of a prospective *contract* between the plaintiff and the third party." Based upon its interpretation of applicable Wisconsin law, the court reasoned that in order for Plaintiffs to show that their relationships with the members of the distribution network rose to a level that warranted protection under the tort of intentional interference with a prospective contract, Plaintiffs had to show that they had some sort of bargained-for right to expect these relationships to continue in the future or, at a minimum, that

they had prospective contractual relationships with the members of the distribution network that were "sufficiently certain, concrete and definite." Because the only evidence Plaintiffs put forward as to the nature of these relationships were Shank's self-serving statements in his affidavit that he expected the distribution network would continue to work for him in the future, the district court concluded that Plaintiffs failed to create a genuine issue of material fact regarding whether these relationships rose to such a level that they were protected by the tort of intentional interference.

On appeal, Plaintiffs contend that the district court construed the tort of intentional interference with a prospective contract too narrowly. While admitting that no Wisconsin court has extended this tort to a case arising out of mere business relations, and not a contract or prospective contract, Plaintiffs nevertheless believe that Wisconsin courts would recognize the tort as a species of interference with prospective contracts. In support of their contention that the scope of this tort should be expanded to protect a party's "expectation" rights in continuing advantageous economic or business relations, Plaintiffs rely on language contained in several federal cases applying Wisconsin law on tortious interference and on the comments to Restatement (Second) of Torts §§ 766, 766B (1979). Plaintiffs first submit that their position on appeal regarding the proper breadth of this tort is supported by this Court's language in *Frandsen v. Jensen–Sundquist Agency, Inc.*, 802 F.2d 941, 947 (7th Cir.1986), in which we stated that "this tort [tortious interference] has undergone a steady expansion and now embraces situations in which the interference is not with a contract right but merely with an expectation," and in *Federal Pants, Inc. v. Stocking*, 762 F.2d 561, 568–69 (7th Cir.1985), in which we indicated that Wisconsin has "recognized a right of action for tortious interference with advantageous economic

relations." Plaintiffs further rely on *Select Creations, Inc. v. Paliafito America, Inc.*, 911 F.Supp. 1130, 1156–57 (E.D.Wis.1995), in which the district court loosely referred to this tort on occasion as the tortious interference with a prospective economic relationship.

Plaintiffs also submit that certain comments to §§ 766 and 766B of the Second Restatement show that the tort of intentional interference with a prospective contract includes business relations that are merely prospective. Section 766B, which Wisconsin courts appear to have recognized if not adopted, *see e.g., Foseid v. State Bank of Cross Plains*, 197 Wis.2d 772, 541 N.W.2d 203, 209 (1995), is entitled "Intentional Interference with Prospective Contractual Relation," and provides that

> [o]ne who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1979). Plaintiffs point to comment c of § 766B as explaining the need to expand Wisconsin's tortious interference doctrine to protect a party's expectation rights in continuing advantageous business relations. Comment c provides, in part, that included among the prospective relations protected by § 766B "is interference with a continuing business other customary relationship not amounting to a formal contract." *Id.* cmt. c. That comment further states that "[t]he expression, prospective contractual relation, is not used in this Section in a strict technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitution-

ary rights ..." *Id.* Similarly, Plaintiffs point to comment c to § 766 of the Second Restatement (defining the tort of "Intentional Interference with Performance of Contract By Third Person") which states, in part, that "some protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking." Restatement (Second) of Torts § 766 cmt. c (1979).

Plaintiffs submit that the cases cited above taken together with the Restatement comments clearly indicate that the district court should have focused on Plaintiffs' expectation rights in continuing their business relations with the members of the distribution network, not their contract rights, when determining whether they provided sufficient evidence of a prospective relationship with the members of the distribution network to withstand summary judgment. We find Plaintiffs' arguments to be unpersuasive for three reasons.

First, as the district court aptly noted, while Wisconsin courts and federal courts applying Wisconsin law have occasionally made passing reference to economic or business relations in analyzing tortious interference claims, it is clear that those courts did not intend to broaden the scope of this tort to cover the type of prospective relation described by the Plaintiffs in this case. For example, in *Frandsen*, the first case Plaintiffs rely on for their proposition that the doctrine of tortious interference should be construed to protect a party's expectation rights in continuing a business relationship, this Court clearly recognized the need for some evidence that a contractual right was interfered with as a prerequisite for maintaining a tortious interference claim. In that case, the plaintiff, a minority shareholder in a closely held corporation, entered into a shareholder agreement with a bloc of majority shareholders. That agreement provided that the majority bloc could not sell their stock in the corporation without first offering to sell their

stock to the minority shareholders at the same price and on the same terms (a "right of first refusal"). Some years down the road, the majority bloc began discussions with the defendant, who was interested in purchasing the principal asset of the corporation. The majority bloc and the defendant eventually reached an agreement in principle that the acquisition would be structured as a stock-for-cash transaction with the defendant purchasing all of the corporation's stock, including both the majority and minority shares. To facilitate this sale, the majority bloc asked each of the minority shareholders to waive their rights under the shareholder agreement. The plaintiff refused, choosing instead to exercise his right of first refusal to buy the majority bloc's shares at the defendant's offer price. However, the majority bloc did not want to sell its shares to the plaintiff, so the majority bloc and the defendant restructured the transaction as a sale of assets to avoid triggering the plaintiff's right of first refusal. As a result of these maneuverings, the plaintiff brought suit against the defendant, charging tortious interference with his contract rights. *See Frandsen*, 802 F.2d at 942–43.

Although Plaintiffs are correct in asserting that we stated in *Frandsen* that the tort of tortious interference "has undergone a steady expansion and now embraces situations in which the interference is not with a contract right but merely with an expectation," *see id.* at 947, Plaintiffs ignore the larger context in which this statement was made—presumably because a more complete examination of our opinion in that case would have fatally undercut Plaintiffs' argument that we have suggested that this tort should be broadly construed to encompass mere business relationships. In *Frandsen*, we first determined that no contractual right of the plaintiff under the shareholder agreement was violated by conducting the sale as an asset transaction because the sale of a corporation's assets does not trigger a right of first refusal applicable to the corporation's stock. *See id.* at 946. Based on

this conclusion, we then stated that "[i]f as we believe no contractual right of [the plaintiff's] was violated by the transaction, it is more than difficult to see how [the defendant] could have been guilty of a tortious interference with [the plaintiff's] contractual rights." *Id.* at 947. It is immediately after this statement, that we indicated that this tort embraces interference with an expectation. But we qualified this generalization by noting that this expansion is limited by competing policies. As we explained:

> One of the most firmly established principles of the common law is that competition is not a tort. Although competition literally is an intentional interference with competitors' prospective contractual relations, to conclude that it is therefore a tort would be as unsound legally as it would be disastrous economically. The courts have not drawn this conclusion; instead they have ruled that while competition is not a defense to a charge of interfering with an existing contract (for a firm should have no right to compete by inducing its competitors' customers to break valid contracts), it is a defense to a charge of interfering with prospective contractual relations, provided it is fair competition, consistent with anti-trust laws and other principles. Competition means little if it does not mean competing for a rival's existing customers (provided that they are not tied to him by contract) as well as for customers new to the market.

*Id.* (internal citations omitted).

Thus, upon closer examination, it becomes clear that *Frandsen* does not support Plaintiffs' position on appeal that a party's expectation that a business relationship will continue is sufficient to sustain a tortious interference claim. For we found in *Frandsen* that the lack of an existing contractual right proved fatal to the plaintiff's tortious interference claim, notwithstanding the fact that the defen-

dant's actions interfered with the plaintiff's expectation that he would have the opportunity to purchase the majority bloc's shares and take control of the corporation if the majority bloc decided to sell its interest in the corporation.

Similarly, Plaintiffs do not present the appropriate context for our statement in *Federal Pants* that Wisconsin courts recognize a cause of action for tortious interference with advantageous economic relations. *See Federal Pants*, 762 F.2d at 568. As the district court noted, we went on to state in *Federal Pants* that in asserting a claim for tortious interference, the plaintiff bears the burden of proving "intentional interference with existing contractual relations." *Id.* at 569. Moreover, with respect to our use of the terms "advantageous economic relations" and "business relationship," we observe that the terminology came from *Chrysler Corp. v. Lakeshore Commercial Finance Corp.*, 389 F.Supp. 1216, 1221 (E.D.Wis.1975), which we cited in describing Wisconsin's recognition of a cause of action for tortious interference. *See Federal Pants*, 762 F.2d at 568–69. In *Chrysler Corp.*, the district court described the elements of a tortious interference claim by quoting dated language from the now-replaced Restatement of Torts § 766 (1939), which provided that a person is subject to liability for causing a third person not to perform a contract or "enter into or continue a business relation with another." *Chrysler Corp.*, 389 F.Supp. at 1221 (citation omitted). However, the American Law Institute amended § 766 in 1979 dropping the reference to "business relation" and replacing it with "prospective contractual relation." *See* Restatement (Second) of Torts §§ 766, 766B (1979); *Cudd*, 364 N.W.2d at 160; *see also Nalco Chem. Co. v. Hydro Techs., Inc.*, 809 F.Supp. 672, 679 (E.D.Wis.1992) (construing a tortious interference with business relations claim as a claim for intentional interference with contract "because interference with business relations appears to be an obsolete cause of action"). In any event, although Plaintiffs would

have us construe our statements in *Federal Pants* as an implicit acknowledgment that mere business relations are sufficient to support a tortious interference claim, we cannot attach any significance to these statements because we never examined the issue of whether the plaintiff in that case satisfied his burden of proof in establishing the existence of a protected relationship in that we concluded that the alleged act of interference was justified.

Finally, a close examination of the opinion in *Select Creations* also illustrates that Plaintiffs overstate the significance of the district court's statement that the tortious interference doctrine protects prospective economic relationships. In that case, the plaintiff was the exclusive distributor of a toy product and the defendants were sales representatives retained as subagents by a company the plaintiff hired to act as its mass merchandising agent with respect to the promotion and sale of this product. While the defendants solicited orders for the product from customers on behalf of the plaintiff for a commission, all product sales were conducted in the name of the plaintiff and the plaintiff was liable to the customer for any breach of contract. One of the customers serviced by the defendants was Toys R Us. The defendants subsequently approached Toys R Us at the manufacturer's behest and instructed Toys R Us to deal directly with them instead of the plaintiff. The plaintiff filed suit against the defendants charging tortious interference with the plaintiff's existing and prospective contractual relationships with Toys R Us. *See Select Creations*, 911 F.Supp. at 1136–49.

As in *Federal Pants*, the court in *Select* used the terms "prospective economic relationship" and "prospective contracts" interchangeably when discussing the plaintiff's tortious interference claim. *See id.* at 1156–57. However, it becomes clear from the court's opinion that it did not consider mere economic or business relations alone to be sufficient to create a

cause of action for tortious interference. The court emphasized that the first element of a tortious interference claim is that "the plaintiff must have had a contract or a prospective contractual relationship with a third party." *Id.* at 1156. In reaching the conclusion that the plaintiff satisfied this element, the court found that the "plaintiff offer[ed] documented proof of both existing and prospective contracts with a third party, Toys R Us, in the form of purchase orders." *Id.* The plaintiff in that case offered evidence from Toys R Us that Toys R Us considered the open purchase orders between them and the plaintiff to be binding contracts. The court also found that the plaintiff had a "sufficiently certain, concrete and definite prospective relationship" with Toys R Us with regard to future sales of this product because the plaintiff owned the exclusive right to distribute the product and had open purchase orders from Toys R Us at the time of the interference, and because Toys R Us continued to purchase these products after their relationship with the plaintiff was interfered with by the defendants. *Id.*

Moreover, when the district court used the term "prospective relationship," the court cited *Sampson Investments v. Jondex Corp.*, 176 Wis.2d 55, 499 N.W.2d 177 (1992), a case in which the Wisconsin Supreme Court stated that "[e]ven where there has been no breach of a contract, a plaintiff seeking to maintain a claim for tortious interference with contract must show some specific right which has been interfered with." *Id.* at 184. In that case, the defendant induced a third party with whom the plaintiffs had entered into a contract, to perform that contract in a manner that was financially detrimental to the plaintiffs even though it did not constitute a breach of the contract. The Wisconsin Supreme Court rejected the plaintiff's tortious interference claim because it could not show that it had any right to require the third party to perform the contract in the manner the plaintiff desired. *Id.* The court concluded that, "[i]n

fact, allowing [the plaintiff's] claim would grant them rights which the parties **did not** bargain for. The inability to show any right which was interfered with is fatal to [the plaintiff's] tortious interference claim." *Id.* Because *Sampson* required more than an expectancy that a contractual relationship would be continued in a certain manner, the *Select Creations* court's reliance on *Sampson* lends further support for the conclusion that the district court in *Select Creations* did not intend to extend the tort to encompass a plaintiff's expectancy of continuing a mere "business relationship."

When these cases are viewed in the proper light, it is clear to us that Plaintiffs' reliance on them to support their argument for a broader application of the tortious interference doctrine is misplaced. As we have set forth in detail above, none of these cases involved a court finding that mere economic or business relations with a third party was sufficient to create a cause of action under Wisconsin law for tortious interference in the absence of an existing contract or sufficiently concrete prospective contract. Instead, as the district court in the instant case fairly surmised, those cases stand for the larger proposition that a tortious interference claim cannot stand without a showing by the plaintiff that the defendant has interfered with some bargained-for right of his or, at a bare minimum, a "sufficiently certain, concrete and definite prospective relationship" between the plaintiff and the third party. Plaintiffs have shown neither.

We have already indicated that Plaintiffs have failed to offer sufficient evidence to show that they had reached any independent agreement with the members of the distribution network to distribute water conditioning products. Thus, we cannot say that Hague's actions in taking over the distribution network interfered with any contractual, quasi-contractual or bargained-for right of Plaintiffs to continue their relationships with those members.

■ Similarly, Plaintiffs have not offered the kind of evidence from which it could be reasonably found that they had "sufficiently certain, concrete and definite prospective relationships" with the members of the distribution network. In *Select Creations*, the court found that the plaintiff had produced sufficient evidence to show that it had a protected prospective relationship with a third party because it had entered into prior purchase orders with the third party *which the third party considered to be binding contracts* and there were open purchase orders at the time of the defendant's interference, the plaintiff was the exclusive distributor of the product, and the third party continued to purchase the product after the defendant's interference. *See Select Creations*, 911 F.Supp. at 1156. In contrast, Plaintiffs cannot come close to making the same showing. Plaintiffs have offered no evidence from any of the members of the distribution network that they considered any document they may have sent to Plaintiffs to be binding contracts as between them and Plaintiffs. Thus, there is no history of prior contracting between Plaintiffs and the members of the distribution network, a factor the *Select Creations* court found to be important when inferring that two parties would likely engage in future protected relations. Moreover, Sieren/WIM, not Plaintiffs, was the exclusive distributor for WaterBoss products and the members of the distribution network entered into written contracts with Sieren/WIM, not Plaintiffs. Therefore, unlike the plaintiff in *Select Creations*, Plaintiffs had no right independent of its relationship with Sieren/WIM to distribute WaterBoss products. Further, although Plaintiffs maintain that they had agreements with the distributors and the representative to distribute products other than WaterBoss, they failed to produce any evidence from the members to support this self-serving assertion. In sum, while Plaintiffs clearly had a beneficial relationship with the distributors and sales representative as a result of Plaintiffs' contractual relationship with Sieren/WIM, they have not shown that their prospective relations with the members of the network were "sufficiently certain, concrete, and definite" and therefore protected.

We also believe that to require a plaintiff to show that it at least had a "sufficiently certain, concrete and prospective relationship" with a third party in order to bring a tortious interference claim is in no way inconsistent with § 766B of the Second Restatement or any of the comments thereto. The crux of that section is that the existence of a formal written contract between a plaintiff and the third party is not necessarily a prerequisite to maintaining a tortious interference cause of action against an interfering defendant. *See, e.g.* Restatement (Second) of Torts § 766B cmt. a (1979) ("This Section is concerned only with intentional interference with prospective contractual relations, not yet reduced to contract."). This does not mean, however, that any prospective business relationship warrants protection. In fact, it only makes sense that to subject a party to liability for allegedly interfering with a prospective relationship, that relationship between the plaintiff and the third party ought to be sufficiently concrete and definite. Indeed, comment c to § 766B states that while a prospective relationship need not "be reduced to a formal, binding contract," § 766B would require some showing that the relationship involved "prospective quasi-contractual or other restitutionary rights." *Id.* cmt. c. Moreover, to the extent that these comments suggest a broader application, Plaintiffs point to no Wisconsin court that has applied § 766B to protect the kind of business relationship Plaintiffs had with the members of the distribution network, and, based on the facts of this case, we see no reason to do so either.

Finally, Plaintiffs' position that its business relationships with the members of the distribution network should be protected under the tort of intentional interference with prospective contractual rela-

tions becomes even less plausible when we take into account the written contracts between Sieren/WIM and the members of the distribution network for the distribution of WaterBoss products. Suppose, for example, that Sieren/WIM terminated their contract with Plaintiffs because they determined that Plaintiffs were not fulfilling their responsibilities under that agreement. And rather than find another independent contractor to assist them in maintaining the distribution network, Sieren/WIM decided to handle the job themselves.[2] Just like Hague's actions in taking direct control over the international distribution network, Sieren/WIM's actions in terminating their relationship with Plaintiffs and running the network without Plaintiffs' assistance would interfere with Plaintiffs' "business relationships" with the distribution network. It cannot seriously be maintained, however, that Plaintiffs would then be entitled to pursue a tortious interference cause of action against Sieren/WIM in light of Sieren/WIM's existing contracts with the members of the distribution network even though the nature of the expectancy interfered with by Sieren/WIM is the same as the expectancy interfered with by Hague. Indeed, under Plaintiffs' theory, no company that was aware that Plaintiffs worked with the members of the distribution network would be able to hire that network to distribute its products independent of Plaintiffs' involvement without incurring the risk of being held liable for tortiously interfering with Plaintiffs' business relations, notwithstanding the lack of a contract or even a prospective contract between Plaintiffs and the members of the distribution network. We have already concluded in *Frandsen* that Wisconsin courts would not cast the net of tortious interference liability so far as to protect this type of business relationship from legitimate competition. *See* 802 F.2d at 947.

### D. Novation

■ Plaintiffs' final argument on appeal is that they provided sufficient evidence to show that a novation occurred by which Shank was substituted for Sieren/WIM in Sieren/WIM's contracts with COB and the distributors. The Wisconsin Supreme Court has defined a novation as "an agreement between the obligor, obligee and a third party by which the third party agrees to be substituted for the obligor and the obligee assents thereto, the obligor is released from liability and the third person takes the place of the obligor." *Brooks v. Hayes*, 133 Wis.2d 228, 395 N.W.2d 167, 174 (1986); *see also Siva Truck Leasing, Inc. v. Kurman Distribs.*, 166 Wis.2d 58, 479 N.W.2d 542, 546 (1991). Under Plaintiffs' novation theory, Sieren/WIM were the obligors, the members of the distribution network were the obligees, and the Plaintiffs were the third party.

■ In support of the argument that a novation occurred, Plaintiffs offered affidavits from Shank and Michael Sieren, both of whom attested that they agreed to this substitution and that all parties, including the members of the distribution network, treated the contracts as between Plaintiffs and the members of the network. However, Plaintiffs have not shown that any of the members of the distribution network, as the obligees, ever assented to the substitutions of Plaintiffs for Sieren/WIM and agreed to release Sieren/WIM from all liability under their contracts with Sieren/WIM. In analyzing a novation that substitutes parties, a court must consider whether "the evidence clearly show[s] consent by *all* the parties." *See Siva Truck Leasing*, 479 N.W.2d at 546 (emphasis added).

**2.** The 1991 contract between Sieren/WIM and Plaintiffs provided that any party could terminate the agreement upon thirty days notice and the 1997 renewal agreement provided that any party could terminate the agreement for cause upon ninety days notice. The terms of Sieren/WIM's contracts with the distributors ranged anywhere from one to five years. So it is perfectly possible that our hypothetical situation above could have occurred.

Plaintiffs have produced no evidence that any of the members ever formally agreed to a novation by placing their assent in writing. Nor have Plaintiffs submitted any affidavits from these members attesting that such a novation occurred. Instead, Plaintiffs submit that members of the distribution network's assent to this substitution can be reasonably inferred from their conduct, which Plaintiffs argue was consistent with a novation because the members took directions from Plaintiffs, were hired and fired by Plaintiffs, and communicated directly with Plaintiffs. While it is true that an "[a]cceptance of the terms of novation may be implied from the facts and conduct of the parties in relation thereto," *see id.*, we, like the district court, remain unconvinced that the facts of this case can be reasonably construed as supporting the inference that the members of the distribution network assented to these alleged novations.

The fact that Sieren/WIM hired Plaintiffs to handle Sieren/WIM's day-to-day affairs of running the distribution network does not suggest that the members of the network assented to these novations and agreed to release Sieren/WIM from liability on their contracts with the members. We see nothing in the contracts between Sieren/WIM and the members that would have precluded Sieren/WIM from delegating responsibilities like those carried out by Plaintiffs to an employee, agent, or independent contractor. Moreover, Plaintiffs have produced no evidence that Sieren/WIM would not have been liable to the members of the distribution network if Sieren/WIM breached any of its obligations to the members under their agreements or if Plaintiffs failed to perform any of Sieren/WIM's contractual obligations to the members that had been delegated to Plaintiffs.

In addition, when one of the members of the distribution network, COB, decided to work for Hague, it sent a letter to Sieren/WIM terminating COB's distribution contract. If COB had accepted the substitution of Plaintiffs for Sieren/WIM, it is reasonable to assume that COB would have sent its termination letter to Plaintiffs rather than Sieren/WIM.

Moreover, the fact that later-added members of the distribution network continued to enter into written contracts with Sieren/WIM also undercuts Plaintiffs' representation that all parties treated the contracts as between the members and Plaintiffs. The network appears to have been continually growing over a period of some five or six years, with additional members being added periodically. Plaintiffs fail to explain why, if the contracts were truly between Plaintiffs and the members, the fiction of having later-added members sign contracts with Sieren/WIM rather than Plaintiffs was necessary.

In sum, the inferences that Plaintiffs would have us draw regarding the existence of a novation substituting them for Sieren/WIM simply are not supported by the facts of this case. Therefore, we conclude that the district court did not err in concluding that Plaintiffs' conclusory allegations that a novation occurred failed to create a genuine issue of material fact sufficient to ward off summary judgment.

### IV. CONCLUSION

Because we agree with the district court that Plaintiffs have failed to create a genuine issue of material fact regarding whether they had any existing or prospective contracts with the members of the distribution network, the district court's grant of summary judgment in favor of Hague is AFFIRMED.