**Ernest F. ALBIERO, Plaintiff,**

v.

**CITY OF KANKAKEE, ILLINOIS, and Donald E. Green, Individually, and as Agent of the City of Kankakee, and Other Unknown Agents of the City of Kankakee, Defendants.**

No. 97–CV–2138.

United States District Court,
C.D. Illinois,
Danville/Urbana Division.

Feb. 24, 2000.

Tony L. Brasel, Bourbonnais, IL, for plaintiff.

Elaine Massock, Richard P. Klaus, Heyl, Royster, Voelker & Allen, Urbana, IL, for defendants.

## ORDER

McCUSKEY, District Judge.

This case is before the court for ruling on a Motion for Summary Judgment (# 29) filed by Defendants, City of Kankakee (City) and the City's Mayor, Donald E. Green (Green). Following a careful review of Defendants' Motion and supporting documentation and Plaintiff's response and supporting documentation, Defendants' Motion for Summary Judgment (# 29) is GRANTED.

## FACTS

Plaintiff, Ernest F. Albiero, owns rental properties located in the City. Plaintiff has a history of filing various lawsuits against the City, most of them unsuccessful. See *Albiero v. City of Kankakee,* 151 F.3d 1032, 1998 WL 416531 (7th Cir.1998) (unpublished opinion) (dismissal of three separate cases filed in district court affirmed on appeal); *Albiero v. City of Kankakee,* 122 F.3d 417 (7th Cir.1997) (dismissal of action affirmed); *Albiero v. City of Kankakee,* 279 Ill.App.3d 1109, 233 Ill.Dec. 721, 701 N.E.2d 571 (1996) (unpublished order) (challenge to constitutionality of City ordinance requiring inspection of residential rental units rejected). In its ruling, the Illinois Appellate Court noted that "[i]t is without question a legitimate governmental purpose to enforce a building code established to protect the lives and property of the City's residents." *Albiero,* No. 3–95–0487, slip op. at 4. However, the Appellate Court also stated that the trial court erred when it issued an injunction requiring Plaintiff to submit to an inspection of his properties and that the trial court "should have required the City to obtain a warrant to search the plaintiff's rental units." *Albiero,* No. 3–95–0487, slip op. at 6.

On June 11, 1997, the City placed a sign in front of rental property owned by Plaintiff at 805 S. Third Street. The sign stated:

**SLUM PROPERTY!**

THE OWNER OF THIS PROPERTY:

ERNEST ALBIERO

P.O. BOX 75, BIG ROCK, IL. 60511

630–556–3210

IS IN VIOLATION OF CITY CODE

AND CHOOSES NOT TO BRING

THIS PROPERTY INTO

COMPLIANCE THEREBY

SIGNIFICANTLY CONTRIBUTING

TO THE BLIGHT IN THIS

NEIGHBORHOOD

On June 30, 1997, Plaintiff filed his original Complaint against Defendants (# 1). This Complaint was dismissed without prejudice. On December 1, 1997, Plaintiff filed an Amended Complaint (# 14). Plaintiff alleged that one of his lawsuits against the City had caused the City to alter its collection practices regarding sewer charges. Plaintiff also alleged that the ruling of the Illinois Appellate Court required the City "to obtain a search warrant before they could enter the property for the purpose of inspection." Plaintiff alleged that Defendants placed the sign on his property to retaliate against Plaintiff for filing lawsuits against Defendants and "to embarrass and humiliate the Plaintiff and force him to sell his property." In Count I, Plaintiff alleged that he was entitled to damages pursuant to 42 U.S.C. § 1983 for Defendants' malicious and retaliatory actions in placing the sign on his property. In Count II, Plaintiff alleged a state law claim for defamation.

On January 20, 1998, United States District Judge Harold A. Baker entered an Order (# 19) which granted Defendants' Motion to Dismiss regarding Count II of Plaintiff's Amended Complaint. However, Judge Baker denied Defendants' Motion to Dismiss as to Count I. Judge Baker determined that Count I of the Amended Complaint adequately alleged "an equal protection claim for selective prosecution/malicious retaliation as outlined by the Seventh Circuit in *Esmail v. Macrane,* 53 F.3d 176 (7th Cir.1995)." Judge Baker noted that *Esmail* equal protection claims are not common and face a number of significant obstacles. Judge Baker indicated that Plaintiff could prevail if he could show that "the action taken by the state, whether in the form of prosecution or otherwise, was a spiteful attempt to 'get' him for reasons wholly unrelated to any legitimate state objective." *Esmail,* 53 F.3d at 180. Judge Baker recognized that "the flip side of this retaliation rhetoric is that any 'legitimate state objective' for the defendant[s'] actions is a complete defense."

On June 10, 1999, Defendants filed a Motion for Summary Judgment (# 29), a Memorandum of Law in Support (# 30), a Statement of Undisputed Facts (# 31) and Supporting Exhibits (# 32). Plaintiff filed a Response to the Motion for Summary Judgment (# 34) with Supporting Exhibits, a Memorandum in Support (# 35), a Response to Defendants' Statement of Undisputed Facts (# 36) and a Statement of Additional Undisputed Facts (# 37). Defendants filed a Reply (# 40) and a Response to Plaintiff's Statement of Additional Disputed Facts (# 39).

The documentation submitted to this court shows that, on June 17, 1996, an administrative search warrant was issued for Plaintiff's property at 805 S. Third Street. An inspection of the property was conducted on July 2, 1996. During this inspection, numerous photographs were taken which showed holes in walls, discoloration of ceiling tile indicating leaking from the roof, inoperative smoke detectors and the generally disgusting condition of the building. On July 8, 1996, the City's Fire Department sent a three-page letter to Plaintiff listing numerous conditions affecting fire safety which were found in the building. The letter stated that the items

listed needed to be given "immediate attention in the interest of fire and life safety." The letter further stated that the dwelling had been posted "UNFIT FOR HUMAN HABITATION." In addition, a letter listing property maintenance code violations in the building was sent to Plaintiff on July 11, 1996. The list of violations was seven pages long. The violations listed included broken doors, broken windows, infestation of roaches and fleas, and the use of extension cords to supply electricity and propane tanks to fuel natural gas stoves in apartments where the power and gas were turned off. Subsequently, on September 25, 1996, 24 citations for ordinance violations were issued to Plaintiff. The circuit court of Kankakee County dismissed the citations on March 11, 1997, for failure to file within the 60 day rule. Presumably, this rule requires citations to be issued within 60 days of the inspection.

On March 19, 1997, an administrative search warrant was issued for the property. A reinspection was conducted by Lillie Jones on March 20, 1997. Again, photographs were taken which show the unsightly condition of the building. Jones testified that, during the reinspection, she saw that violations remained and noted poor workmanship on the repairs which had been done. She stated that the following violations remained: (1) ground fault interceptors in the bathrooms which were not properly tripping; (2) roaches; (3) no covers on bathroom lights; (4) loose handrails; (5) water stains on ceilings; (6) missing trim in the living room on the first floor; (7) deteriorating wood around the toilet in the third floor apartment; (8) badly worn carpet in the first floor apartment; and (9) garbage in the yard. Jones testified that the missing trim was a violation because it leaves a back draft for fires. A plumbing inspection was also done on March 20, 1997. According to a memo to the City's code enforcement department, the plumbing inspector found numerous problems with the plumbing in the building, including no water in some of the bathrooms and an uncapped sewer gas line. The plumbing inspector stated that the building remained unfit for human habitation. On April 8, 1997, the City's Fire Department sent a letter to Plaintiff listing code violations which needed to be corrected. However, no citations were issued based upon the March 20, 1997, inspection.

In April 1997, Green saw a newspaper article regarding the use of slum lord signs in Syracuse, New York. Around the same time, the City received a petition signed by 93 residents which complained about the condition of property located at 2020 W. Station Street. The petition asked that measures be taken to insure that the owner would "restore the well being of this property." The mayor discussed the idea of using slum lord signs to attempt to improve rental property in the City with City Attorney Christopher Bohlen and some of the City's alderman. Bohlen testified that he then developed a policy so that the signs would be placed in a consistent manner. The policy, set forth in an undated memo, stated that signs would be placed at locations which: (1) appear dilapidated and not in compliance with applicable property maintenance codes based upon exterior appearance; (2) have received repeated citations for failure to comply with applicable property maintenance codes; (3) have been the subject of repeated complaints by neighbors; and (4) have a clearly deleterious effect upon the neighborhood in which they are located.

Green testified that he made the decision to use the signs. He testified that the purpose of using the signs was to bring rental properties back into code compliance. Bohlen testified that the intent behind the policy was to give neighbors a means to let property owners know of their dissatisfaction with the condition of the property and to motivate the owners to bring their properties into compliance. Green testified that Terry Lewis, the assistant chief of the City's Fire Department who oversees the code enforcement divi-

sion, and Larry Nolan, the code official in charge of day-to-day operations, recommended properties for placement of slum lord signs. After reviewing the files on these properties, Green made the decision regarding which properties would have a sign placed. Green initially identified five properties for placement of slum lord signs. The first property was the one referred to in the citizens' petition. Plaintiff's property was the third to receive a slum lord sign. Green testified that the first five properties chosen were properties which had consistently not been in compliance with the code established by the City. In regard to Plaintiff's property, Green reviewed information in the file regarding the July 2, 1996, inspection and the March 20, 1997, inspection, including the photographs. In addition, Green testified that he passed the building on a daily basis on his way to and from work. He testified that it was obvious that the building was not in compliance with City codes. Green stated that he saw extension cords running from the upstairs windows to the downstairs windows and that a door was missing on the front of the building. Green also stated that the building had weeds growing and was not maintained well on the exterior. Based upon the policy established by Bohlen, Green believed that the property was a slum property. Bohlen, Lewis, and Nolan all testified that they believed the property met the criteria to be considered a slum property.

As of August 20, 1997, the City had put up 14 slum lord signs. At his deposition on October 18, 1998, Green testified that the City had put up between 19 and 22 signs and that approximately 7 of the signs have been removed based upon compliance with the City's code. According to Bohlen, Plaintiff's property was in substantial compliance with the code as of December 18, 1998. Following the December 18, 1998, inspection, the sign in front of 805 S. Third Street was removed.

Plaintiff testified that he always has code violations repaired by his workman within 72 hours. He stated that no code violations existed at 805 S. Third Street on the date the slum lord sign was posted. However, Lewis testified that the records showed that six code violations still existed during an inspection of the building on November 17, 1997, and Nolan testified that numerous code violations existed on August 18, 1998.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *Schmidt v. Runyon*, 20 F.Supp.2d 1246, 1248 (C.D.Ill.1998). "Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial." *Schmidt*, 20 F.Supp.2d at 1248. There must be evidence upon which a jury could reasonably find in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment. *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 394 (7th Cir.1998).

## II. EQUAL PROTECTION CLAIM

■ Plaintiff admits that his only claim in this case is a § 1983 equal protection claim against Defendants for selective prosecution/malicious retaliation as outlined by the Seventh Circuit in *Esmail.* In *Esmail,* the Seventh Circuit held "that the equal protection clause provides a remedy when a 'powerful public official picked on a person out of sheer vindictiveness.'" *Olech v. Village of Willowbrook,* 160 F.3d 386, 387 (7th Cir.1998), *aff'd* in *Village of Willowbrook v. Olech,* — U.S. —, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (quoting *Esmail,* 53 F.3d at 178). This type of claim has been categorized as a "class of one" claim and applies when the government is treating unequally persons who are prima facie identical in all relevant respects to prevent the government from singling out "a hapless individual, firm, or other entity for unfavorable treatment." *Indiana State Teachers Ass'n v. Board of School Comm'rs,* 101 F.3d 1179, 1181–82 (7th Cir.1996); see also *Payton v. Rush–Presbyterian–St. Luke's Med. Ctr.,* 184 F.3d 623, 632 n. 7 (7th Cir.1999); *Levenstein v. Salafsky,* 164 F.3d 345, 353 (7th Cir.1998). The Seventh Circuit held that the equal protection clause can be invoked by a person who can prove that the "action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Esmail,* 53 F.3d at 180; see also *Pleva v. Norquist,* 195 F.3d 905, 917 (7th Cir.1999); *Olech,* 160 F.3d at 387. The " 'vindictive action' class of equal protection cases requires proof that the cause of the differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendant."

*Olech,* 160 F.3d at 388. Therefore, if "the defendant would have taken the complained-of action anyway, even if it didn't have the animus, the animus would not condemn the action; a tincture of ill will does not invalidate governmental action." *Olech,* 160 F.3d at 388. The ill will must be the *sole* cause of the action of which the plaintiff complains. *Olech,* 160 F.3d at 388.

Accordingly, to prevail on his § 1983 equal protection claim, Plaintiff must prove that Defendants "singled him out" for differential treatment in a spiteful effort to "get" him for reasons wholly unrelated to any legitimate state objective. As noted early on in this case by Judge Baker, this type of case is difficult to prove and fails if the defendant proves a "legitimate state objective" for the action.

■ The evidence presented to this court showed that Plaintiff's property was in deplorable condition on July 2, 1996, and, as of March 20, 1997, was found to still have numerous violations of the City's code. In addition, the evidence showed that Defendants placed slum lord signs not only on Plaintiff's property but also on at least 18 other properties in an attempt to get the properties into code compliance. This court concludes that this evidence is sufficient to show that Plaintiff was not "singled out" for differential treatment and that Defendants had a "legitimate state objective" for their action. Accordingly, Defendants have met their burden to demonstrate the absence of a genuine issue of material fact. Therefore, to avoid summary judgment, Plaintiff must come forward with specific evidence which demonstrates that there is a genuine issue for trial.

In his response to the Motion for Summary Judgment, Plaintiff challenges the slum lord sign policy and notes that the policy was not approved by the City Council or adopted as an ordinance. Plaintiff further notes that the City did not notify property owners prior to placing the signs

and did not follow the procedures set out in Bohlen's memo in executing the policy. Plaintiff also argues that the policy of placing slum lord signs did nothing more than encourage neighbors to harass owners of property. This court notes that the evidence supports Plaintiff's argument that Defendants' decision to put up slum lord signs was not particularly well thought out or part of a well-defined policy. In fact, the slum lord sign policy may not have been the best or most effective way to deal with the problem of rental properties in poor condition. However, that is not the issue before this court. The sole issue before this court is whether Plaintiff has presented enough evidence to create a genuine issue of material fact regarding his claim that Defendants "singled him out" for differential treatment when they placed the slum lord sign on his property and that Defendants' action was a spiteful effort to "get" him in retaliation for the prior litigation between the parties and was wholly unrelated to any legitimate state objective.

█ Plaintiff argues there is a genuine issue of material fact for trial because he presented evidence that no code violations existed at the property on June 11, 1997, when the City put the sign in front of the property. In his deposition, Plaintiff testified that none of the violations found on the property were significant and that no violations existed on the date the slum lord sign was posted. Plaintiff has also filed an affidavit in which he states that no violations existed on the date of placement of the sign. However, the only evidence of this is Plaintiff's own self-serving statements which are not based upon a personal inspection but only on his stated "policy" of having his workman repair any violations within 72 hours. Self-serving assertions which have no factual support in the record are not sufficient to defeat a motion for summary judgment. *James v. Sheahan,* 137 F.3d 1003, 1006 (7th Cir.1998); see also *Shank v. William R. Hague, Inc.,* 192 F.3d 675, 682 (7th Cir.1999); *Schacht v.*

*Wisconsin Dept. of Corrections,* 175 F.3d 497, 504 (7th Cir.1999). In this case, there is a noticeable absence of evidence to support Plaintiff's assertions in his deposition and affidavit. See *Shank,* 192 F.3d at 682. The record contains ample evidence of the poor condition of the property at 805 S. Third Street. Plaintiff's self-serving statements that the property had no code violations simply are not sufficient to create a genuine issue as to any material fact in this case.

The record before this court shows that the property was in poor condition and Defendants could reasonably believe, and did believe, that the property contained violations of the City's code and met the criteria to be classified as "slum property." The record also shows that Defendants put up at least 19 slum lord signs for the purpose of trying to motivate property owners to improve their properties and bring the properties into code compliance. Plaintiff has presented no evidence that the other properties where signs were placed were in worse condition than his property. Although there may be questions regarding the wisdom of the slum lord sign policy, there can be no real dispute that trying to get property owners to bring their properties into code compliance is a "legitimate state objective." See *Albiero,* No. 3–95–0487, slip op. at 4 ("[i]t is without question a legitimate governmental purpose to enforce a building code established to protect the lives and property of the City's residents"). In short, Plaintiff has not presented any competent evidence that Defendants "singled him out" for differential treatment when they placed the slum lord sign on his property and that Defendants' action was a spiteful effort to "get" him in retaliation for the prior litigation between the parties and was wholly unrelated to any legitimate state objective. Accordingly, there is no genuine issue of material fact in this case which requires a trial and Defendants are entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED THAT:

(1) Defendants' Motion for Summary Judgment (# 29) is GRANTED. Judgment is entered in favor of Defendants and against Plaintiff.

(2) This case is terminated. The parties shall be responsible for their own court costs.