Marcia M. DAVIS–DURNIL, Plaintiff,

v.

VILLAGE OF CARPENTERSVILLE, ILLINOIS, Defendant.

No. 98 C 7618.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 1, 2001.

---

Robert William Funk, II, Schirott & Luetkehans, P.C., Itasca, IL, James Thomas

Harrison, Clay M. Ullrick, Harrison Law Offices, P.C., Woodstock, IL, Lisa Gabrielle Williams, Law Office of Fern N. Trevino, Chicago, IL, for plaintiff.

Bernard Z. Paul, DeKalb, IL, Charles E. Hervas, Kimberly D. Fahrbach, Dana M. Shannon, Hervas, Sotos, Condon & Bersani, Itasca, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court is Defendant's motion for summary judgment. For the following reasons, the motion is granted.

## I. BACKGROUND

Plaintiff, Marcia Davis–Durnil ("Davis") brings this suit under the American with Disabilities Act ("ADA") and Title VII, 42 U.S.C. § 2000e. The facts underlying this suit are largely undisputed. The court takes the following facts from the parties' Local Rule 56.1 statements, and notes any disputes in the text.

Davis has been a police officer with the Village of Carpentersville (hereinafter "the Village") since 1980. Except for a short assignment as a high school liaison officer in 1990–91, Davis has been a patrol officer her entire career.

In September 1993, while in the line of duty, Davis shot a suspect. Over the next year, Davis suffered anxiety attacks, which worsened as a trial involving the shooting approached. Davis was having difficulty functioning in both her professional and personal lives, and sought help from the Village's employee assistance program. The employee assistance program referred Davis to a Dr. Vedak, who diagnosed Davis as having post traumatic stress disorder ("PTSD") and atypical depression with panic attacks. Dr. Vedak recommended that Davis take an immediate medical leave from work, and either be hospitalized or attend intense outpatient treatment.

Beginning October 11, 1994, Davis took medical leave from her duties, and received outpatient treatment at the Horizons Counseling Center for several hours per day, five days per week. Davis remained on leave until November 17, 1994. At that time, Davis received a medical release to return to work, and resumed her duties as a patrol officer. By all accounts, Davis and the Village had an amicable relationship between November 1994 and February 1997, when things took a turn for the worse.

On February 26, 1997, Davis participated in a police training seminar. The seminar consisted of several simulated shooting exercises where a videotaped scenario was projected on a large screen. The participants used laser guided simulated weapons, and would move around, shoot, and seek cover as necessary. After each participant went through a scenario, the range officer and participant would discuss the participant's actions. The range officer then evaluated the participant's decisions.

Following Davis' participation in the simulations, the discussions between Davis and the range officer were argumentative. Davis became upset during these conversations, said she was stressed, and then began crying, having chest pains, and difficulty breathing. After Davis' third shooting scenario, she was crying and handed her simulation weapon to the range officer, saying that she was done with the exercise. Davis then said she was having an anxiety attack and left the room. Another officer tried to make contact with Davis, and found her in a bathroom with the door closed. Davis emerged from the bathroom about ten minutes later and spoke with the officer. Davis said that she suffered from PTSD, and that this sort of thing could happen at any time without warning. Police Chief Ben Blake was advised of the situation, and sent Davis home for the rest of the day.

The following day, Chief Blake instructed Davis to meet with a psychologist for an examination on February 28, 1997. Davis appeared for her meeting with the psychologist, but for reasons not found in the

record, did not complete the appointment. Effective March 3, 1997, the Village placed Davis on temporary administrative duty until her psychological evaluation and assessment were completed. While on temporary administrative duty, Davis continued to receive her full pay, benefits, and accrual of benefits. Davis also retained possession of her service weapon, and kept her title of patrol officer.

On March 11, 1997, Davis received a letter from Chief Blake scheduling a second meeting between Davis and a psychologist for March 14, 1997. Chief Blake's letter stated that Davis' behavior during the training exercise caused concern about her ability to function as a police officer in the stressful situations portrayed in the simulation. Chief Blake also wrote that he was considering Davis' problems that occurred after her September 1993 shooting. Attached to the March 11th letter were forms for Davis' signature that authorized release of mental health records and consented to an independent psychological examination. Davis signed the consent form, but added a lengthy disclaimer stating that she was signing the form under duress, and reserving her right to take legal action against the Village and the psychologist. The psychologist declined to meet with Davis because of the language she placed on the consent form.

On April 21, 1997, Chief Blake sent another letter to Davis reiterating his concerns about Davis' fitness for duty and setting up an appointment for Davis to meet with a different psychologist on April 25, 1997. This letter included the same authorization and consent forms as before. Davis again added her disclaimer language, and reserved her right to take legal action against the psychologist and the Village. This psychologist also declined to meet with Davis.

On July 31, 1997, Chief Blake sent another letter, setting up a another appointment for Davis and different psychologist, Dr. Hartman. This time, Davis executed the authorization and consent forms, and met with Dr. Hartman on August 6th. On August 8th, Dr. Hartman sent a short letter to Chief Blake explaining that he evaluated Davis, found her fit for duty, and that a full report would follow. Dr. Hartman sent his full report to Chief Blake on August 15, 1997. After reading Dr. Hartman's report, Chief Blake no longer had concerns about Davis' fitness for duty. Davis returned to patrol officer duties on September 10, 1997.

Davis claims that she was harassed by two patrol officers and a sergeant during the time she was on administrative duty, March 3, 1997 to September 10, 1997. The harassment consisted of these officers asking Davis questions, such as whether she was studying for a psychology exam, or if she would make badges or ash trays for them if she returned to the Horizons Counseling Center for treatment. Davis also claims that one of her fellow officers offered to be her doctor, so he could certify her as crazy and she could "pension out." Davis asserts that these questions and comments came at least a couple of times a month, and maybe as often as once a week during the time she was on administrative duty.

In 1997, the Village had in place an anti-discrimination policy that prohibited harassment in the workplace based on, among other things, disabilities. The policy instructed employees that felt victimized by harassment to report the harassment to the Village Manager, and that all such complaints would be investigated. Davis did not report the allegedly harassing conduct to the Village Manager, but claims to have mentioned to a supervisor that she was being treated unfairly.

On November 25, 1998, Davis filed this suit alleging that the Village violated the ADA and Title VII by discriminating against her because of her PTSD and gender. Davis claims to be disabled because of her 1994 treatment for PTSD, and because the Village regarded her as disabled when it placed her on administrative duty

and ordered a psychological exam. Davis also maintains that the questions and comments of her fellow officers constitute a hostile working environment in violation of the ADA. As to the Title VII claim, Davis alleges that the Village placed her on administrative duty because of her gender, and that similarly situated male officers were not placed on administrative duty.

The Village now moves for summary judgment, arguing that Davis is not covered by the ADA, has not suffered · an adverse employment action, was not subject to a hostile working environment, and has no evidence of gender discrimination.

## II. DISCUSSION

### A. Standards for summary judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consolidated High School District No. 230,* 991 F.2d 1316, 1320 (7th Cir.1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. *See Murphy v. ITT Educational Services, Inc.,* 176 F.3d 934, 936 (7th Cir.1999); *see also Shank v. William R. Hague, Inc.,* 192 F.3d 675, 682 (7th Cir.1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. *See e.g. Navarro v. Fuji Heavy Industries, Ltd.,* 117 F.3d 1027, 1030 (7th Cir.1997). If the plaintiff fails to come up with the required proof, the defendant is entitled to summary judgment. *See id.* It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. *See Rand v. CF Industries, Inc.,* 42 F.3d 1139, 1146–47 (7th Cir.1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. *See Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment. *See* Fed.R.Civ.P. 56(c), *see also, Perdomo v. Browner,* 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), *see also, First Nat. Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 280, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 922 (7th Cir.1996). The choice between reasonable inferences from facts is a jury function. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Davis' ADA Claims:

Davis asserts two distinct types of ADA discrimination, disparate treatment and hostile work environment. The court addresses each in turn.

#### 1. ADA Disparate Treatment:

■ The ADA prohibits discrimination against "a qualified individual with a disability because of the disability...." 42 U.S.C. § 12112(a). To that end, the ADA recognizes disparate treatment discrimination. *See generally Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1283 (7th Cir.1996) (citing *De Luca v. Winer Indus.,* 53 F.3d 793, 797 (7th Cir. 1995)). The prima facie case for ADA disparate treatment is: (1) the plaintiff is disabled within the meaning of the ADA; (2) the plaintiff's work performance meets the employer's legitimate expectations; (3) the plaintiff suffered an adverse employment action; and (4) the circumstances

indicate that it is more likely than not that the plaintiff's disability was the reason for the adverse employment action. *Spath v. Hayes Wheels Int'l–Indiana, Inc.*, 211 F.3d 392, 396 (7th Cir.2000).

Davis can prove her disparate treatment case with either direct evidence of discrimination or indirectly through the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See De Luca*, 53 F.3d at 797; *see also Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir.2000) (analyzing the *McDonnell Douglas* test in an ADA/age discrimination case). Direct evidence of discrimination is "smoking gun" evidence, such as "We fired you because of your disability." *Robin*, 200 F.3d at 1088. Because such evidence is rare, a plaintiff can also proceed using indirect evidence of discrimination and the *McDonnell Douglas* burden shifting approach. *Id.* Under the burden shifting method, a plaintiff raises a presumption of discrimination by proving her prima facie case by a preponderance of the evidence. *See id.* The burden then shifts to the employer to articulate a legitimate non-discriminatory reason for its action. *Id.* If the employer does so, the presumption of discrimination disappears, and the plaintiff must prove by a preponderance of the evidence that the employer's stated reasons are a pretext for intentional discrimination. *Id.* Pretext means a lie. Specifically, the plaintiff must demonstrate that the employer's stated reason is phony or completely lacking a factual basis. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012–13 (7th Cir.2000); *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir.2000). As the Seventh Circuit pointed out in *Robin*, the burden shifting framework is not a rigid analysis, rather it is tool for the court to determine the need for a trial. *Robin*, 200 F.3d at 1088–89. If a plaintiff does not have direct or indirect evidence that is conclusive in itself, the plaintiff may be able to defeat summary judgment by composing a convincing mosaic of direct and indirect evidence of discrimination. *Id.*

Here, the parties dispute whether Davis has a prima facie case, but the court finds this case to be more appropriately analyzed under the *McDonnell Douglas* approach. The court is not required to analyzed the prima facie case. It can assume that a plaintiff has a prima facie case and proceed directly to the question of pretext. *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir.1999) (assuming that plaintiff met burden of establishing prima facie case and deciding the matter on pretext issue); *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395 (7th Cir.1998) (same). Thus, the court assumes, without deciding, that Davis has a prima facie case of ADA disparate treatment. As discussed below, however, the court finds that the Village had a legitimate reason for its actions, and Davis presents no evidence of illegal discrimination.

 The Village states a valid reason for placing Davis on administrative duty after the simulator event—its concern about her ability to function as a police officer in the stressful shooting situations depicted in the training simulation. An employer is entitled to inquire into the mental health of its employees when there are legitimate concerns about employee and public safety. *See Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir.2000) (citing *Duda v. Franklin Park Pub. Sch. Dist. 84*, 133 F.3d 1054, 1060 (7th Cir. 1998)). Indeed, the ADA does not provide a shield from fitness for duty examinations for employees with jobs that affect public safety. *See Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) ("[T]he ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries."). Especially in the context of police officers, employers do not violate the ADA by ensuring that officers are psychologically fit for duty. *See id.* (holding that a police department did not violate the ADA by

requiring a fitness for duty examination of an officer who displayed hostile behavior towards other officers and the public); *see also Krocka,* 203 F.3d at 515 (no violation of the ADA where a chronically depressed police officer was required to undergo a fitness for duty examination); *Miller v. City of Springfield,* 146 F.3d 612, 615 (8th Cir.1998) (no violation of the ADA where a police department did not hire an applicant who failed a psychological examination); *Metzenbaum v. John Carroll Univ.,* 987 F.Supp. 610, 615–16 (N.D.Ohio 1997) (no violation of the ADA to request mental health records of a campus police officer that displayed bizarre behavior); *Barnes v. Cochran,* 944 F.Supp. 897, 901–02 (S.D.Fla.1996) (no violation of the ADA not to hire a deputy sheriff applicant with a history of Vietnam flashbacks, and who experienced nightmares, blackouts, and hallucinations under stress), *aff'd,* 130 F.3d 443 (11th Cir.1997). The Seventh Circuit stated the concept clearly in *Krocka:* "It was entirely reasonable, and even responsible, for [the Chicago Police Department] to evaluate [the officer's] fitness for duty once it learned that he was experiencing difficulties with his mental health." *Krocka,* 203 F.3d at 515. Such is the case here. Davis admits that she suffered an emotional breakdown during a simulated shooting exercise and was unable to complete the exercise due to an anxiety attack. Davis then left the simulation, and stated that she had PTSD and that similar attacks could occur at any time. It is a fact of life that police officers encounter stressful situations, and may be called upon to use their weapons in the line of duty, as Davis herself had to do in 1993. Based on the above cited authority, the Village was well within its rights to place Davis on administrative duty and order a psychological examination of her.

Thus, the question becomes whether Davis has evidence that the Village lied about its actions. *See Paluck,* 221 F.3d at 1012–13 (discussing pretext); *Jordan,* 205 F.3d at 343 (same). As stated in *Robin,* Davis can survive summary judgment if she presents a mosaic of evidence of discrimination, from which a jury could infer that the Village was lying. *See Robin,* 200 F.3d at 1088–89. Davis attempts to present such a mosaic with the following evidence: (1) Chief Blake specifically relied on Davis' previous mental health problems in deciding to place her on administrative duty; (2) Chief Blake also relied on the fact that Davis started crying during the shooting simulations and told the range officer that she was having a panic attack; (3) Chief Blake testified that he was unsure whether Davis could perform her duties, but did not place any restrictions on her other than the administrative duty assignment; (4) Chief Blake allowed Davis to carry her service weapon during administrative duty despite the fact that he was unsure about her ability to use the weapon; (5) other officers displayed emotional outbursts, such as kicking desks and throwing items, and were not required to undergo psychological testing; (6) Chief Blake delayed reinstating Davis to patrol after Dr. Hartman pronounced her fit for duty; and (7) three times Davis complied with the Village's instructions to meet with a psychologist before the meeting took place. The court addresses each of these factors and finds that Davis fails to raise a question of material fact.

The court rejects Davis' first two points, that Chief Blake's reliance on Davis' past PTSD and her behavior during the shooting simulation, is evidence of discrimination. As discussed above, the Village could rely on those facts to place Davis on administrative duty and order a psychological exam without violating the ADA. *See Krocka,* 203 F.3d at 515; *Watson,* 177 F.3d at 935; *Miller,* 146 F.3d 612 at 615; *Metzenbaum,* 987 F.Supp. at 615–16; *Barnes,* 944 F.Supp. at 901–02. Rather than demonstrating discrimination, these facts justify the Village's actions.

Davis' next two points are also without merit. Davis claims that allowing her to

retain her service weapon and allowing her to perform administrative duty is evidence of discrimination. Contrary to the implications of Davis' argument, the steps an employer takes to address concerns about fitness for duty are not evidence of discrimination. *See Krocka,* 203 F.3d at 515 ("The steps taken to reassure an employer that an employee is fit for duty where there is a legitimate concern about an employee's ability to perform a particular job are not proof in a case such as this one that the employer regarded the employee as disabled."). And, in this case, the Village took steps that were narrowly construed to address its concerns. The Village was concerned about Davis' ability to handle shooting situations, and placed her on administrative duty where she was unlikely to encounter such a situation. Davis was allowed to retain her full pay, benefits, accrual of benefits, service weapon, and title during her placement on administrative duty. The Village should not incur liability for taking this reasonable course of action in light of its concerns about Davis' fitness for duty. *Compare id.* at 511 (noting the district court's finding of an adverse employment action by placing the plaintiff, a chronically depressed officer, into a program for officers with disciplinary problems).

Davis presents no evidence to support her next claim, which is that other officers displayed similar emotional outbursts but were not placed on light duties or forced to undergo psychological testing. As noted earlier, Davis has the burden to present evidence that could persuade a jury to accept her version of events. *See Shank,* 192 F.3d at 682; *Navarro,* 117 F.3d at 1030. The only evidence Davis provides is her own testimony that other officers kicked desks and threw things, but were not reassigned or forced to undergo psychological exams. Davis presents no evidence to support these allegations, such as the identity of the officers, their mental health history, or the context of the alleged outbursts. Moreover, Davis presents nothing to indicate that she has per-

sonal knowledge of any actions taken by the Village in response to the alleged outbursts. Davis' testimony is mere speculation, which is insufficient to defeat summary judgment. *See Rand,* 42 F.3d at 1146–47 (noting that something more than hunches and speculation is necessary to survive summary judgment).

Next, Davis argues that the Village unfairly delayed in reinstating her after Dr. Hartman cleared her for duty. As the Seventh Circuit noted in *Krocka,* an employer's response to a fitness for duty examination may provide evidence of discrimination. *See Krocka,* 203 F.3d at 515. In this case, however, the Village's response to Davis' fitness evaluation does not indicate discrimination. Dr. Hartman examined Davis on August 6, 1997, and sent a short letter to Chief Blake on August 8th, informing him that Davis was fit for duty and that a full report would follow. The entire letter stated:

> As a result of the psychological evaluation of August 6, 1997, it appears that Officer Marcia Davis is fit for duty and can return to work. A complete report will follow.

(Def.'s Local Rule 56.1 Ex. 0.) This letter is somewhat equivocal on Davis' fitness for duty. In light of Davis' history of PTSD and behavior during the simulator exercise, the Village was entitled to evaluate Dr. Hartman's full report before making a decision about returning her to patrol duty. *See Krocka,* 203 F.3d at 515; *Watson,* 177 F.3d at 935; *Miller,* 146 F.3d 612 at 615; *Metzenbaum,* 987 F.Supp. at 615–16; *Barnes,* 944 F.Supp. at 901–02. Dr. Hartman sent his full report to Chief Blake on August 15, 1997, and Davis was reinstated on September 10, 1997. The record is silent as to the reason for the delay between Dr. Hartman's full report and Davis' reinstatement. In any event, Davis returned to patrol duty approximately three weeks after Dr. Hartman sent the report. Even construing this short delay in Davis' favor, it is at best a

scintilla of evidence of discrimination, and is insufficient to defeat summary judgment.

Finally, the Village promptly arranged a psychological examination for Davis. In what can only be described as a hollow argument, Davis asserts that the delay between March 1997 and August 1997 in completing her psychological examination is evidence of discrimination. This delay was Davis' doing, not the Village's. It was she who added disclaimer and reservation of rights language to the consent forms, which resulted in the psychologists declining to meet with her. She will not now be heard to complain of the ensuing delay.

Even construing all of Davis' evidence together, she fails to raise a question of fact for trial. Davis admits that she had PTSD, and that she suffered an anxiety attack during a simulated shooting exercise. These facts allowed the Village to confirm her fitness for duty for her safety, as well as the safety of her fellow officers and the public. Davis fails to present any evidence that the Village lied about these facts, or took its actions to discriminate against her, rather than out of a concern for her ability to function as a police officer. And, the undisputed facts demonstrate that the Village acted reasonably in addressing Davis' situation. The Village placed Davis on administrative duty, allowed her to retain her title and all benefits, promptly arranged a psychological exam for her, and returned her to patrol duty shortly after learning that Davis was fit for duty. Accordingly, the court grants summary judgment in favor of the Village on Davis' disparate treatment claim.

## 2. ADA Hostile Work Environment:

Davis also claims that she was subject to a hostile work environment because of her disability. The Seventh Circuit has not yet definitively held that a hostile work environment claim is cognizable under the ADA. *See Conley v. Village of Bedford Park*, 215 F.3d 703, 712–13 (7th Cir.2000). In *Silk v. City of Chicago*, 194 F.3d 788 (7th Cir.1999), the Seventh Circuit assumed, but did not decide, that a disabled employee could bring a hostile work environment claim. *Silk*, 194 F.3d at 803–04. Assuming the cause of action exists, there has not yet been a case where the Seventh Circuit has approved of granting relief in favor of an ADA plaintiff asserting a hostile work environment claim. The cause of action, if it exists, is analogous to Title VII hostile work environment claims. *Id.* This court too will assume arguendo that a hostile work environment claim is cognizable under the ADA and analyze Davis' claim.

In order to be actionable, a hostile work environment must be sufficiently severe or pervasive, so as to alter the conditions of employment. *See Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1143–44 (7th Cir.1997) (citing cases). " 'Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.' " *Gleason*, 118 F.3d at 1143–44 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993)). "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Gleason*, 118 F.3d at 1143–44 (quoting *Harris*, 114 S.Ct. at 371). Under this standard, a single incident of severely offensive conduct is actionable, as are repeated instances of less offensive conduct. *See Smith v. Sheahan*, 189 F.3d 529, 533–34 (7th Cir.1999) (holding that a single severe incident of sex-based harassment was sufficient to state a Title VII claim); *see also Ellerth*, 118 S.Ct. at 2262–63 (outlining repeated instances of offensive conduct that were actionable as a hostile work environment). The conduct giving rise to the hostile work environment claim must be both objectively and subjectively offensive, so that the work environment is hostile or abusive. *See Faragher* 118 S.Ct. at 2283. As the Seventh Circuit has often

iterated, mere off-color remarks are insufficient to support a Title VII claim, and generally speaking, "unpleasant atmosphere" cases are not actionable. *See Baskerville v. Culligan Int'l.*, 50 F.3d 428, 430–31 (7th Cir.1995) (citing cases and noting the sometimes murky line between actionable harassment and merely offensive behavior); *see also Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 n. 2, 3 (7th Cir.1994) (citing cases of non-actionable incidents of unpleasant behavior and cases of actionable discrimination).

Davis' allegations of hostile work environment are limited to the comments made by two fellow patrol officers and a sergeant during the time that she was on administrative duty, March 3, 1997 to September 10, 1997. The harassment consisted of these officers asking Davis questions and commenting about her psychological health. For example, officers asked Davis if she was studying for a psychology exam, or if she would make badges or ash trays for them if she returned to the Horizons Counseling Center for treatment. One officer offered to be Davis' doctor, so he could certify her as crazy and she could "pension out." Davis asserts that these comments came at least a couple of times a month, and maybe as often as once a week during the time she was on administrative duty. The court construes these comments in the light most favorable to Davis, i.e., the court assumes the comments were ill-intentioned, they occurred once a week, and Davis found them subjectively offensive.

This case is easily decided in light of the *Silk* decision, which detailed far worse treatment that was not actionable as a hostile work environment. Silk was an officer with the Chicago Police Department who suffered from a sleep disorder. *Silk*, 194 F.3d at 794–95. Because of the disorder, Silk requested and received a permanent assignment to a day shift so he could have a consistent sleep pattern. *Id.* Thereafter, Silk began teaching classes at Chicago State University once a week from 6–7:30 p.m. *Id.* at 795. The Chicago Police Department discovered Silk's secondary employment, and ordered him to stop, stating that since Silk could not work a third shift for the police, there was no reason to allow him to work any segment of that shift for an outside employer. *Id.*

After the police department accommodated Silk's sleeping disorder, he claimed that he was subject to a hostile work environment, including: (1) verbal harassment, such as being called a useless piece of [vulgarity], a medical abuser, a limited duty phony, and having his condition referred to in roll call as a [vulgarity] medical problem; (2) threats of physical violence, such as bomb threats, and another sergeant threatening to kick Silk's [vulgarity], telling Silk to get out of his way, and stating that it wouldn't take much for the sergeant to knock Silk on his [vulgarity]; (3) lowered performance ratings; (4) compelled loss of his teaching job; and (5) administrative harassment, such as losing earned days of leave without justification, being told not to "act up" to supervisors, losing supervisory authority over other patrol officers, and being ridiculed. *Id.* at 796–97.

The Seventh Circuit considered the cumulative effect of Silk's treatment, and found that it did not alter the conditions of his employment and did not rise to the level of a hostile work environment. *Id.* at 807–08 (stating that Title VII excludes instances of hostile treatment that have little or no effect on an employee's job) (quoting *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.1998)). The court noted that Silk continued to do his job without impediment from the harassment. *Silk*, 194 F.3d at 808. "Silk failed to demonstrate that the workplace was permeated with discriminatory conduct—ridicule, intimidation, insult—that was sufficiently severe or pervasive to alter the conditions of his employment." *Id.*

In this case, the comments and questions of which Davis complains are far less offensive than the treatment Silk re-

ceived. Even construing everything in Davis' favor, as the court must, the environment she complains of is not objectively offensive enough to alter the conditions of Davis' employment. Indeed, there is nothing to demonstrate that Davis' job performance was impeded by the alleged harassment. The comments and questions from fellow officers were uncalled for and insensitive, but were not threatening, humiliating, or of a nature that would disrupt Davis' ability to perform her job. The most that can be said is that Davis was insulted by the officers' conduct. While unfortunate and unpleasant, such insults do not constitute a hostile work environment.

 And, even if Davis was subject to a hostile work environment, the Village is not liable for the harassment. An employer is vicariously liable for hostile work environment harassment when the harasser is a supervisor. *See Silk,* 194 F.3d at 804. When the harasser is a co-worker, the employer is only liable if the employer was negligent. *See id.* In what is commonly known as the *Ellerth* defense, an employer can avoid vicarious liability for Title VII harassment committed by a supervisor with immediate or successively higher authority over the employee if the employer: (1) exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities that the employer provides. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). This defense is not available if the supervisor's harassment "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* Here, Davis claims that one of the harassers was a sergeant who had supervisory authority over her, so the court analyzes the Village's vicarious liability under the standards announced in *Ellerth.*

 As a preliminary matter, there is no evidence of a tangible employment ac-

tion resulting from the alleged hostile environment. A tangible employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2268. "A tangible employment action in most cases inflicts direct economic harm." *Id.* at 2269. Davis presents nothing that qualifies as a tangible employment action. The questions and comments from the other officers are not tangible employment actions. *See Ellerth,* 118 S.Ct. at 2268–69 (discussing the rationale of the defense, and noting that tangible employment actions bear the official weight of the employer); *cf. Robinson v. Truman College,* No. 97 C 896, 1999 WL 33887 at \*6 (N.D.Ill. Jan.19, 1999) (holding that a supervisor no longer advising and reassuring a plaintiff over her job is not a tangible employment action). Davis does not argue that her assignment to administrative duty is a tangible employment action, and even if she did, the argument would fail. Davis kept her job, pay, benefits, and title, and suffered no economic harm as a result of the changed duty.

Next, the Village had in place an anti-discrimination and anti-harassment policy, which prohibited discrimination based on disability. "While not required as a matter of law . . . the existence of an appropriate anti-harassment policy will often satisfy [the] first [*Ellerth*] prong . . . because Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms." *Shaw v. AutoZone, Inc.,* 180 F.3d 806, 811 (7th Cir.1999) (internal citations and quote marks omitted), *cert. denied,* 528 U.S. 1076, 120 S.Ct. 790, 145 L.Ed.2d 666 (2000). Here, the Village has a policy that forbids discrimination and harassment based on, among other things, disabilities. The policy also specifically instructs persons that feel they are the victim of harassment to report the conduct to the Village Manager. This policy satisfies the

first *Ellerth* prong. *See Shaw*, 180 F.3d at 811–12 (finding a that a detailed anti-harassment policy satisfied the first prong of *Ellerth*); *see also Schoiber v. Emro Marketing Co.*, No. 95 C 5726, 1999 WL 825275 at * 12 (N.D.Ill. Sept.21, 1999) (chambers opinion holding that an anti-harassment policy that did not tolerate harassment and provided multiple mechanisms for promptly resolving disputes was sufficient for the first *Ellerth* prong).

And, Davis did not report the alleged harassment to the Village Manager. An employer is entitled to the affirmative defense if the plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 118 S.Ct. at 2270. "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* Here, the Village argues, and Davis admits, that she never reported the alleged harassment to Village management. Davis, on the other hand, argues that (1) she told her supervisor that she was being treated unfairly; (2) the harassment was readily apparent to anyone on the day shift; and (3) that complaining to management would have been pointless because management was responsible for her plight.

Davis' arguments are unavailing. Davis' assertion that she told her immediate supervisor she was being treated unfairly begs a couple of questions. Who was treating her unfairly? And, what exactly was unfair? The court will not speculate on the answers to these questions. It is Davis' burden to come forth with evidence that shows the need for a trial. *See Shank*, 192 F.3d at 682; *Navarro*, 117 F.3d at 1030. Passively worded and vague complaints of unfair treatment do not suffice.

Similarly lacking evidence is Davis' assertion that the harassment was readily apparent to anyone on the day shift. The only evidence of this is Davis' own self-serving conclusion, which is insufficient. *See Shank*, 192 F.3d at 682; *Navarro*, 117 F.3d at 1030. Davis presents nothing to demonstrate that she has personal knowledge of what other people on the day shift observed, and she cannot avoid summary judgment by speculating about their observations. *See Rand*, 42 F.3d at 1146–47.

Finally, Davis offers no valid reason for not reporting the conduct of other officers to management. The law requires Davis to take reasonable advantage of opportunities to report sexual harassment. *See Ellerth*, 118 S.Ct. at 2270. Anti-discrimination law is not self enforcing, and the subjective unpleasantness of reporting discrimination does not alleviate the employee's duty under *Ellerth* to notify the employer of harassing conduct. *Shaw*, 180 F.3d at 812–13. Davis says that management was responsible for her predicament, and that reporting the harassing conduct of other officers to management would only open her up to more harassment. This is not a valid reason for failing to report the conduct of other officers. *See id.* Davis' argument also blurs the distinction between her placement on administrative duty and the allegedly hostile environment. Village management was not offending Davis with unkind questions and comments. Rather, other officers were the ones that offended Davis. Thus, it is specious of her to say that she could not approach management about the conduct of other officers.

In sum, the court assumes, but does not decide, that the ADA recognizes a hostile work environment claim. Davis, however, fails to present evidence to support such a claim. The conduct of which she complains is not objectively offensive enough to alter the conditions of her employment. And, even if Davis did present evidence of

a hostile environment, the Village would be entitled to the affirmative defense announced in *Ellerth*.

## C. Title VII

Davis alleges that the Village discriminated against her on the basis of gender in violation of Title VII. To succeed, Davis must demonstrate: (1) she is a member of a protected group; (2) she was qualified for the job and was meeting the Village's legitimate job expectations; (3) she suffered an adverse employment action; and (4) the Village treated similarly situated male officers more favorably. *See Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086–87 (7th Cir.2000). Davis asserts that all elements are present because she is female, she met job qualifications, she was placed on administrative duty, and male officers exhibiting similar emotional outbursts were treated more favorably. The Village argues, and the court agrees, that Davis does not have evidence of similarly situated male officers receiving more favorable treatment.[1]

It is Davis' burden to provide evidence sufficient to raise a triable question of fact that similarly situated male officers received better treatment than she did. *See Shank*, 192 F.3d at 682; *Navarro*, 117 F.3d at 1030. Davis alleges: (1) Officer John Terry sought treatment for emotional problems, but the Village did not require him to undergo psychological testing; (2) Officer Bill Gromer experienced difficulty in controlling his breathing at the scene of a child's death, and that he did not have to undergo psychological testing afterwards; and (3) unnamed male officers exhibited fits of anger, such as kicking desks and throwing items, but were not required to submit to psychological examinations. Davis neglects to provide any details surrounding these alleged incidents, such as when they occurred, the context in which they occurred, how the incidents affected the ability of the officers to function as police officers, the mental health history of the officers, whether the use of weapons or simulated weapons was involved, and even the identity of some of the officers. Moreover, Davis provides no basis for her conclusion that the officers did not undergo psychological testing. Rather, she just asserts ipse dixit that it is so. As the court has noted several times in this opinion, unsubstantiated self serving conclusions do not raise a question of fact for trial. *Shank*, 192 F.3d at 682; *Navarro*, 117 F.3d at 1030; *Rand*, 42 F.3d at 1146–47. Davis has the burden of coming up with factual evidence. Her spin on facts not in the record does not entitle her to a trial. *See Rand*, 42 F.3d at 1146–47. Accordingly, the court grants summary judgment in favor of the Village on Davis' Title VII claim.

## III. CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of the Defendant, Village of Carpentersville. Case terminated.

IT IS SO ORDERED.

---

1. The Village also contests whether Davis suffered an adverse employment action. The court does not reach that argument.