NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3255
_____

EMMETT COLEMAN,
                              Appellant

v.

PENNSYLVANIA STATE POLICE
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 11-cv-01457)
District Judge:  Hon. Cynthia R. Eddy
_____

Submitted Under Third Circuit LAR 34.1(a)
March 4, 2014

Before:   McKEE, Chief Judge, AMBRO AND JORDAN, *Circuit Judges*.

(Filed: March 20, 2014)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Emmett Coleman appeals a grant of summary judgment by the United States

District Court for the Western District of Pennsylvania to the Pennsylvania State Police

Department ("PSP") in this employment discrimination action.  For the reasons that

follow, we will affirm.

## I.     Background

### A.     *Factual Background*

On June 2, 2008, PSP hired Coleman, an African American male, as a State Police Cadet. In Pennsylvania, a Cadet is required to undergo eighteen months of training before becoming a full-fledged State Trooper: six months of training at the Pennsylvania State Police Academy – which Coleman successfully completed in December 2008 – and twelve months of field training as a probationary Trooper. It is undisputed that, at the time of his dismissal, Coleman was still a probationary Trooper.

Over eight months into his on-the-job training, Coleman was involved in an off-duty car accident and suffered a traumatic brain injury and multiple facial fractures. As a result, he took medical leave from July 26, 2009, until October 28, 2009. He returned to work in a "limited duty" capacity through December 31, 2009, when he was approved to return to "full duty" work.[1]

On February 1, 2010, however, Coleman was forced back to limited-duty status after suffering a seizure at night. His neurologist, Dr. Heidar K. Jahromi, diagnosed him with posttraumatic epilepsy and prescribed Coleman anti-seizure medication. Despite that treatment, Coleman suffered two more seizures, or at least to exhibit seizure-like symptoms, in April and August of 2010, although he failed to report the second incident

---

[1] Working with the Pennsylvania State Troopers Association, Coleman had entered into an agreement with PSP in November 2009 that extended his probationary period for the length of time that he was on leave and on limited duty as a result of his car accident.

until November 2010. The parties agree that, as of the time they filed their appellate briefs in September 2013, Coleman had been seizure-free since August 2010.

Under PSP policy, a Trooper – whether probationary or not – is "not … permitted to perform full duty until he or she remains seizure free for a period of 5 years." (App. at 254 (Pennsylvania State Police Seizure Policy).) That policy, known as the "Seizure Protocol," was established in 2006 by Dr. Michael S. Marrone, who was at that time the Medical Officer for the State Police and was a board-certified physician in family practice. To develop the Seizure Protocol, he drew on his own research into epilepsy recurrence as well as consultations with the chief epileptologist at Hershey Medical Center. Dr. Marrone's research indicated that once an individual goes "seizure-free" for five years, he or she approaches the "risk of the general population," which is "less than two percent." (App. at 285-86 (Dr. Marrone's Deposition).) But if a person has recurrent seizures, the risk of another seizure is "anywhere from 75 to 90 percent." (*Id*. at 284.) The Protocol therefore provides that a Trooper must "report any initial or subsequent seizure activity, onset of epilepsy or involuntary loss of consciousness." (*Id*. at 254.) At the same time, it contains exceptions for certain types of disorders – for example, a "sudden hypoglycemic episode" (Appellee's Br. at 15) – which were to be addressed by Dr. Marrone through an "individual evaluation of [each officer's] particular case using the seizure policy as a framework" to determine a Trooper's fitness-for-duty. (App. at 308 (Dr. Marrone's Deposition).)

Based on a review of Coleman's medical history, Dr. Marrone determined that Coleman "couldn't perform full duty" – since, in the event of a seizure, he would be

unable to perform many of the functions that are required of PSP Troopers – and that the correct course was to follow the Seizure Protocol. (App. at 400 (Dr. Marrone's Deposition).) Subsequently, PSP's Human Resources Director, Kim Studenroth, directed Coleman's troop, Troop J, to determine whether the Troop had any limited duty assignments available for Coleman. Captain Brenda Bernot, the Troop's commanding officer, testified that she had "absolutely no difficulty accommodating [Studenroth's] request" and that the Troop could "more than accommodate Trooper Coleman for five years," the length of the Seizure Protocol, given how busy the Troop was. (*Id*. at 432 (Bernot's Deposition).) She went on to note that Coleman had "excellent potential" and that everyone whom he worked with gave him "glowing recommendations." (*Id*. at 436-37 (Bernot's Deposition).)

Nevertheless, on October 6, 2010 – roughly ten months after Coleman should have completed his probationary training if he had remained healthy – PSP's Human Resources Directorate began the formal process of termination. The institutional concern was that "Coleman would not be able to resume full duty until August of 2015 at the earliest, and every subsequent seizure would re-start the five-year clock again." (Appellee's Br. at 17.) Moreover, because the size of the PSP was "limited not only by budgetary realities but also by statute," the Human Resources Directorate considered both Coleman's "medical limitations" as well as "operational implications" in evaluating his case. (*Id*.) PSP's Deputy Commissioner George Bivens, who PSP identified as one of the key decisionmakers in Coleman's termination, was responsible for reviewing Coleman's file and discussed Coleman's prognosis and capabilities with Studenroth,

4

Bernot, and others. At the same time that Bernot advocated on Coleman's behalf upon learning of Human Resources' recommendation for termination,[2] she also asked Bivens "for additional troopers because she was shorthanded ... in that troop." (*Id*. at 227-228.) Ultimately, Bivens recommended Coleman's termination to the PSP Commissioner, and a letter dated January 24, 2011, informed Coleman that he would be terminated effective February 4, 2011. The letter also informed Coleman of his right to apply for disability retirement and offered to assist him should he wish to pursue civilian employment with the Commonwealth of Pennsylvania.

Shortly after learning of the letter, Bernot advised Bivens that Coleman's treating physician, Dr. Jahromi, was in the process of releasing Coleman to return to full-duty work. On January 27, 2011, shortly after PSP informed Coleman of his impending termination, Dr. Jahromi submitted to PSP a "Physician's Diagnosis and Prognosis" form, which cleared Coleman for full-duty work as of February 7, 2011. Dr. Jahromi specifically noted on the form that he found Coleman to be "excellent for seizure control" and later testified that he considered the likelihood of Coleman suffering another seizure to be low, perhaps "[o]ne percent, 2 percent, 3 percent." (App. at 421, 499.) According to Coleman, Dr. Jahromi also reviewed "a list of essential job functions" of a PSP Trooper before completing the form. (Appellant's Opening Br. at 16.)

Upon receiving Dr. Jahromi's clearance, Dr. Marrone reiterated his belief that Coleman "may not return to full duty, nor can he perform critical duties." (App. at 516.)

---

[2] Apparently, Bernot was initially notified by her superiors that Coleman's treating physician did not recommend his return to full duty. That is incorrect, and it is unclear from the record how or why Bernot was informed as such.

That same day, Studenroth, Bernot, and Bivens were notified of the divergent medical opinions and received a recommendation that PSP "advocate on behalf of the member until proven otherwise." (App. at 520.) Bernot believed that an independent medical examination was appropriate.

Bivens decided instead to personally meet with Dr. Marrone and Studenroth on February 3, 2011, in an attempt to make sense of the two conflicting medical opinions.[3] After reviewing Dr. Marrone's analysis, including his statistics – *i.e.*, that a person who suffered two seizures is "[75 to] 90 percent" likely to suffer a third within a five-year period – Bivens was "convinced" that the decision to terminate was correct. (App. at 231, 233.) He therefore recommended that Coleman be dismissed. Two additional letters were issued, one following the other and each denominated as an "Amended Correspondence," finally terminating Coleman's employment effective February 18, 2011.[4] (App. at 425-28.)

B. *Procedural History*

Coleman brought suit against PSP pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C.

_____

[3] From the record before us, neither Dr. Jahromi nor any independent neurologist attended the meeting.

[4] After PSP issued its second termination letter to Coleman (*i.e.*, the first Amended Correspondence), Dr. Jahromi requested that Dr. Michael Sperling, a neurologist from Jefferson University Hospital, consult on Coleman's case. Dr. Sperling was less sanguine about Coleman's prognosis, confirming in large part Dr. Marrone's view that the "probability of additional seizures is 80 to 85 percent after having two." (App. at 601-02 (Dr. Sperling's Deposition).) PSP admits that it was unaware of Dr. Sperling's opinion when it made its decision to terminate.

6

§ 12133; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. The Court granted PSP's motion for summary judgment, finding no genuine issue of material fact regarding "(1) whether Plaintiff was 'otherwise qualified to perform the essential functions' of a PSP full status trooper (he was not); (2) whether PSP could have made reasonable accommodations that would have allowed him to become 'otherwise qualified to perform the essential functions' (it could not have); and (3) whether PSP treated similarly situated white persons with seizure disorders more favorably (it did not)." *Coleman v. Pennsylvania State Police*, No. 11-1457, 2013 WL 3776928, at *1 (W.D. Pa. July 17, 2013).

Coleman timely appealed.[5]

## II.    Discussion[6]

Coleman makes three arguments under the Rehabilitation Act, asserting that the District Court erred by holding that he was not qualified for the position of State Trooper, that it further erred in deciding that his employment posed a "direct threat" to public safety, and that there was error again in saying that PSP did not fail to reasonably

---

[5] The Court also held that Title II of the ADA does not provide a plaintiff with a private right of action in an employment context. Coleman does not appeal that issue.

[6] The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4). We exercise jurisdiction over Coleman's appeal pursuant to 28 U.S.C. § 1291. "Our review of a District Court's grant of summary judgment is plenary," *In re Lemington Home for Aged*, 659 F.3d 282, 289 (3d Cir. 2011), such that we undertake the same inquiry as the District Court. Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

accommodate him. In addition, Coleman also argues that, contrary to the District Court's conclusion, he did prove race discrimination under Title VII.

A. *Rehabilitation Act*

In pertinent part, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ... ." 29 U.S.C. § 794(a). The standards used to determine whether the Act has been violated are the same standards applied under the ADA. *Id.* § 794(d); *see also Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002). To prove discrimination under the Act, a plaintiff must show "(1) that he or she has a disability[;] (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996). If a plaintiff succeeds in making that showing, then the burden shifts to the defendant to prove, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable or would pose an undue hardship on the employer. *Id.*

While it is uncontested that Coleman satisfies the first and third elements of his claim – namely that he had a disability and was terminated – the District Court was correct in concluding that Coleman did not show that he is "otherwise qualified to perform the essential functions of the job." *Id.*; *see also Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) ("[T]he burden is on the employee to prove that he is an

otherwise qualified individual." (alternation in original) (internal quotation marks

omitted)). To be "otherwise qualified," a court "must consider whether the individual

satisfies the prerequisites for the position, such as possessing the appropriate educational

background, employment experience, skills, licenses, etc."[7] *Gaul*, 134 F.3d at 580

(internal quotation marks and citation omitted). Such "qualification standards," as they

are called, must be met for an individual "to be eligible for the position held or desired."

29 C.F.R. § 1630.2(q). Since Coleman never completed his probationary training as

required by PSP, he never received the full educational experience necessary to become a

State Trooper. He therefore was not "qualified" at the time of his dismissal.[8] While

Coleman counters by saying that "PSP fail[ed] to allow [him] to work," and thus

complete his training, that argument appears to take issue with one of the qualification

standards itself, the requirement that a Trooper candidate be sufficiently healthy that the

---

[7] *Gaul* provides a two-part test. The second part requires an individual to "perform the essential functions of the position held or desired, with or without reasonable accommodation." 134 F.3d at 580 (internal quotation marks omitted). We need not reach the second part since Coleman fails on the first.

[8] Coleman counters by arguing that he "possessed the qualifications to become a cadet." (Appellant's Opening Br. at 30.) That misses the point, however. In the example he cites regarding an accountant, he himself notes that "the first step in determining whether an accountant who is paraplegic is qualified for a certified public accountant (CPA) position is to examine the individual's credentials to determine whether the individual is a licensed CPA." (*Id.* at 31 (citing 29 C.F.R. pt. 1630, app. § 1630.2(m)).) The example itself explains that the CPA must be licensed. That is part and parcel of the qualification. Unlike in accounting, however, a police officer is trained on-the-job. If he or she has not completed that training, he or she is not qualified. The passing of the licensing exam is tantamount to being in sufficient health to overcome the Seizure Protocol.

9

Seizure Protocol poses no barrier to employment. (Appellant's Opening Br. at 33.) We therefore turn to an examination of the Protocol.

As the District Court correctly noted, an employer may assert a defense to a charge of discrimination by showing that a contested qualification standard is "consistent with business necessity" or that it prevents an individual from posing "a direct threat to the health or safety"[9] of others in the workplace. 42 U.S.C. § 12113(b)-(c). In the context of regulations governing law enforcement officers, courts have found that "employers do not violate the ADA by ensuring that officers are ... fit for duty." *Davis-Durnil v. Vill. of Carpentersville*, 128 F. Supp. 2d 575, 580 (N.D. Ill. 2001); *see also Maull v. Div. of State Police, Dep't of Pub. Safety, State of Delaware*, 141 F. Supp. 2d 463, 474 (D. Del. 2001) ("[C]ourts have also recognized a distinction when the employee is a law enforcement officer. The ADA permits employers to consider whether an individual poses a direct threat … when considering whether an employee is qualified, and in the case of police officers, ensuring public health and safety is the sine qu[a] non

---

[9] Direct threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. ... In determining whether an individual would pose a direct threat, the factors to be considered include: (1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r). While the burden is generally on the employer to prove the existence of a direct threat, *see EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 520 (W.D. Pa. 2010), when "the essential job duties necessarily implicate the safety of others," the burden "may be on the plaintiff to show that she can perform those functions without endangering others." *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) (internal quotation marks omitted). We need not decide whether the burden falls on Coleman or PSP because, in any event, PSP has proffered sufficient facts to sustain a direct threat defense.

10

of their job."); *Ethridge v. Alabama*, 860 F. Supp. 808, 816 (M.D. Ala. 1994) (finding that shooting in a specified stance is an "essential function" that must be performed by police officers). In this case, the Seizure Protocol is consistent with the law because it appropriately addresses the issue of whether a Trooper candidate's employment would pose a "direct threat."[10] As Dr. Marrone explains, "[t]he issue is the probability of having another incapacitating seizure ... at a critical time." (App. at 319 (Dr. Marrone's Deposition).) Dr. Marrone specifically established the protocol to ensure that State Troopers are fully capable to accomplish their duties and, equally significant, that Troopers do not put themselves, their colleagues, or the public in harm's way. Since, according to his research, an individual with two seizures is 75 to 90 percent more likely to suffer a third seizure within a five-year period, the time period of five years is a reasonable requirement and suited to the end for which it is designed.[11] Coleman's

_____

[10] The "business necessity" and "direct threat" provisions of the ADA, both codified in 42 U.S.C. § 12113, can be viewed together here since, in practice, they overlap in the context of law enforcement. Of course, a defendant need not satisfy the direct threat defense every time that a safety qualification has an adverse impact on a disabled employee. As the Ninth Circuit has stated, it may be sufficient for the employer simply to rely on the business necessity defense as laid out in the statute. *See Morton v. United Parcel Serv., Inc.,* 272 F.3d 1249, 1258 n.10 (9th Cir. 2001). In this case, however, we need only address the "direct threat" provision, since PSP more than adequately addresses its application.

[11] Coleman complains that PSP justified its decision, after the fact, by referencing Dr. Sperling's opinion. It is true that the only information that matters in evaluating an employer's decision is what the employer relied on in making the decision. *See Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524, 537(3d Cir. 2007) ("In turn, the Defendants could not have been motivated by knowledge [they] did not have ... and thus cannot now claim that Bowers was deemed a nonqualifier because of his drug abuse." (alterations in original) (internal quotation marks and citation omitted)). And, while PSP

11

argument that PSP somehow fails to effectively assert a defense – because it "does not claim that [he] could not perform the essential functions of his position," only that "his performance of those functions would cause too great a risk to others" – is not only a misstatement of PSP's position, but, more problematically, misses the point. (Appellant's Opening Br. at 37.)  At the end of the day, PSP has adequately explained that the threat of a seizure is significant enough to constitute a "direct threat" and that the Seizure Protocol is a justified response to that threat.

Furthermore, while the Rehabilitation Act demands an "individualized determination," *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 193 (3d Cir. 1999), such a determination does not necessitate that PSP conduct an independent medical examination or even that Dr. Marrone examine Coleman directly.[12]  Dr. Marrone was well aware of Coleman's seizure history and applied the Seizure Protocol only after reviewing Coleman's file and learning that Coleman had suffered a "generalized clonic/tonic seizure."  (App. at 324 (Dr. Marrone's Deposition).)  According to Dr. Marrone, his responsibility was only to "evaluat[e] the possible adverse effects and risks of the

correctly notes that Dr. Sperling's testimony could be relevant insofar as it may serve as the "gold standard" of medical research in epilepsy (Appellee's Br. at 40 (internal quotation marks removed)), that would not justify using his opinion as a post-hoc rationalization.  Nevertheless, Coleman's concern about PSP's references to Dr. Sperling's opinion are, in the end, irrelevant, because no reliance on that opinion is needed to decide this case.

[12] As the District Court notes, "[a] strong case could be made that PSP's Seizure Protocol was the sort of qualification standard that may properly be applied in blanket fashion, without individualized assessment." *Coleman*, 2013 WL 3776928, at *19.  *See also Ward v. Skinner*, 943 F.2d 157 (1st Cir. 1991), *cert. denied* , 503 U.S. 959 (1992).

medicines [the Troopers are] using as it relates to ... their fitness of duty" (*id*. at 358): in other words, he had no right to interfere with a physician's recommended treatment and also did not necessarily need to re-examine troopers or trooper-candidates whose fitness for duty was in question. But, as the Chief Medical Officer, he did have the authority to override a treating physician's recommendation that someone be given full-duty or limited-duty work. In fact, that was his primary responsibility and exactly what he did in this instance.[13]

With respect to "reasonable accommodations" under the Rehabilitation Act, we have held that an employee can succeed only if he can "demonstrate that a specific, reasonable accommodation would have allowed [him] to perform the essential functions of [his] job." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 320 (3d Cir. 1999). "[E]mployers are not required to modify the essential functions of a job in order to accommodate an employee." *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir. 2000). An employee claiming a failure of reasonable accommodation must be able to point to "vacant, funded positions whose essential duties he was capable of performing,

---

[13] As the District Court correctly noted, "Dr. Marrone can and has suspended the protocol when good medical evidence confirms there is no safety issue," thereby applying an individualized assessment. *Coleman*, 2013 WL 3776928, at *20. The issue here is only that Coleman disputes the likelihood of him suffering another seizure. He admits that a seizure would incapacitate him, making him unable to perform the "essential functions of his position" (Appellant's Opening Br. at 36); he simply disagrees that Dr. Marrone's opinion should matter more than his own doctor's. Unfortunately for Coleman, there is no law to bar PSP from trusting its own physician's assessment of risk over that provided by Coleman's treating physician. *Cf. Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004).

with or without reasonable accommodation, and that these positions were at an equivalent level or position as [the position he had.]." *Shiring v. Runyon*, 90 F.3d at 832. An employer is not required "to create a new position in order to accommodate an employee with a disability, or transform a temporary light duty position into a permanent position." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 614 (3d Cir. 2006).

Coleman failed to establish that PSP had available any such vacant and funded positions. Although Bernot testified that she could "more than accommodate Trooper Coleman for five years" (App. at 432 (Bernot's Deposition)), PSP would be required to create a new position for Coleman for that purpose, since Coleman's slot would need to be filled as well. Bernot acknowledged as much when she requested additional Troopers. Creating a new position, however, is more than federal law or its accompanying regulations require.

B.     *Title VII of the Civil Rights Act of 1964*

Under Title VII, to make a prima facie showing of race discrimination, a plaintiff must demonstrate that: (1) he or she belongs to a protected class; (2) he or she was qualified for the position; (3) he or she was subject to an adverse employment action despite being qualified; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). Since we have already established that Coleman was not qualified for the position he sought, thus failing to satisfy his burden, further analysis is unnecessary.

**III.    Conclusion**

This case presents a truly unfortunate set of facts, and our conclusion reflects no lack of respect for Mr. Coleman or his goal of becoming a State Trooper.  That being said, however, he was not qualified to be a Trooper at the time of his dismissal, and we must therefore affirm the District Court.